THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KEVIN KING, Defendant-Appellant.

Third District    No. 80-118

Opinion filed September 17, 1980.

Robert Agostinelli and Charles W. Hoffman, both of State Appellate De-
fender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and Kenneth A.
Wilhelm, both of State's Attorneys Appellate Service Commission, of counsel), for
the People.

Mr. JUSTICE STOUDER delivered the opinion of the court:

The defendant, Kevin King, initiated this appeal following his
conviction for burglary in the Circuit Court of Peoria County. As a result
of being found guilty by a jury, the defendant was sentenced to a
determinate term of imprisonment of three years.

In this appeal, the defendant raises two issues. The first is whether he
was proven guilty beyond a reasonable doubt. The second is whether the
trial court erred by instructing the jury on a theory of accountability
where the evidence, according to the defendant, does not support such a
theory. To determine the merit of the defendant's contentions, the facts
established at the trial must be examined.

For the State, Leroy Mack testified that he previously was a jailer at
the Peoria County Sheriff's Department. On October 30, 1975, Mack took

a set of the defendant's fingerprints, and People's exhibit No. 1 was the set of fingerprints he took from the defendant.

Mary Jo Watson testified that she resided at 2123 S. Griswold, Peoria, and had lived there since April 1979. On October 3, 1979, Watson left her home at 2:45 p.m. to go to work. When she left, both her front and rear doors were locked, and her kitchen windows were closed and secured by a coat hanger which was twisted through the latches.

When Watson returned home at 11:15 that night, she entered through the front door which she unlocked with the key. She noticed, however, that the kitchen light, which she had left off, was on and that four window panes in her kitchen windows were broken. The curtains on the kitchen window were half off. The shade was pulled completely down and ripped half way off the rod. After observing this, Watson asked Brenda Yates, her next door neighbor, to call the police. Ms. Yates lived in the next apartment with her mother, Myrts Yates, and her seven brothers and sisters.

In a few minutes a police officer arrived. Watson asked the officer to accompany her to the second floor of her apartment. Upstairs in her bedroom, Watson observed that the bedspread and mattress were pulled off the bed, the dresser drawers were pulled out, and clothes were scattered all around the room.

While the police officer was still in the apartment, the defendant and someone named Joe came by. Watson testified that she knew the defendant because she had seen him almost every day at the Yates' apartment.

On direct examination, Watson stated that the defendant had been in her apartment only once prior to the night of the incident. At that time, Watson was playing cards with some people, and the defendant came inside her front door but did not go into the kitchen. Watson also stated that the defendant had never been in her kitchen in her presence. On cross-examination, Watson recalled that the defendant had also been in her apartment during the summer of 1979 to fix her stereo, but although she did not believe the defendant entered the kitchen, she could not state for certain that the defendant had not entered her kitchen during that visit because it had been so long ago. She did recall that on that occasion she got a knife for him from the kitchen.

Watson testified that she did not give the defendant permission to enter her house on October 3, 1979. The only item which Watson noticed was missing after the break-in was her television set, which she had left on a portable stand in the living room. When she arrived home, the television was gone and the stand was in the kitchen. The day following the break-in, the television set was returned by Larry Yates, who also lived next door.

Peoria Police Officer Jeffrey Adams testified that on the night of October 3, 1979, he investigated the break-in at Ms. Watson's apartment.

Inside the kitchen, Adams noticed that two panes had been broken out of the kitchen window. Adams described the window as four feet by four feet. It is divided into four sections, each having three panes of glass. Two of the sections swing open into the house. Adams noticed that a coat hanger was wrapped around one of the handles on the window. The screen and blinds were on the floor.

Adams also noticed what looked like latent fingerprints and smudges on the window. He secured the area and called for a "lab man" to come to the scene. No one touched the glass after Adams arrived in the apartment.

While Adams was there, a neighbor, Larry Yates, came into the house and spoke with Ms. Watson. Several minutes later, Henry Joe Pittman and the defendant came into Watson's apartment and stepped inside the kitchen, but they did not go near the window. Officer Adams spoke with Yates and Pittman while the defendant stood next to Pittman. Adams stated to them that he had found fingerprints on the window. The defendant, Yates and Pittman stayed approximately two minutes and left.

In the upstairs bedroom, Adams observed that the room had been ransacked. All the dresser drawers were open and the mattress was pulled off the box spring. Adams remained in the apartment while it was processed by Officer Lapin.

Later that night, Officer Adams saw the defendant at the corner of Griswold and Krause. Adams had been informed by the lab man that defendant's fingerprints had been identified on the window in Watson's apartment. Adams arrested the defendant and, after advising the defendant of his rights, spoke with him.

According to Adams, the defendant stated that he did not commit the burglary, but that he knew that Henry Joe Pittman had done it. Upon further questioning, the defendant stated that he did not actually see Pittman enter Watson's apartment, but saw Pittman leaving the area of Watson's apartment with a large object in his hands. When Adams told defendant that his fingerprints had been found in Watson's apartment, defendant stated that he had been in Watson's house numerous times and was a close friend of Watson's.

Peoria Police Department crime scene technician Wayne Lapin testified that he examined Ms. Watson's apartment on October 3, 1979. He observed that the kitchen door had a pane of glass removed from the lower right hand corner. He also observed that the kitchen window had two or three broken panes, with some glass broken out and some fragments remaining in the panes. Lapin described the window as being "bifold," with a center support post, two center sections of windows that swing outward, and two stationary window sections, one on each side. Each window section contained three panes.

Lapin testified that the center panes on both swing-out window sections were broken. In the broken pane on the right side, as one faced the

window from inside the apartment, all but a small corner of the glass had been broken out. The piece of glass that remained was approximately 4½ feet from the floor and was approximately four inches across on the diagonal.

Lapin processed both the inside and outside of the broken piece of glass which remained in the center pane. He developed a latent impression on the outside surface and several impressions on the inside surface. Lapin identified the upper portion of People's exhibit No. 2 as the three identifiable impressions from the inside surface and the lower portion of People's exhibit No. 2 as the one unidentifiable impression lifted from the outside surface. The unidentifiable impression on the outside surface was exactly opposite the three-finger impression lifted from the inside surface.

Lapin stated that he compared the three identifiable impressions and macrophotographs of those impressions with a set of the defendant's known fingerprints. In his expert opinion, the latent impressions removed from the inside surface of the broken kitchen window were fingerprints from the second, third and fourth fingers of the defendant's right hand. Lapin was unable to state whether the unidentifiable impression found on the outside surface of the window did, in fact, come from an individual's fingers. He did, however, explain and demonstrate to the jury in what position the defendant's hand would have to be to make those fingerprints.

Lapin testified that he processed the kitchen door and doorknob but that they yielded no identifiable fingerprints. The television stand was found to be too soiled to examine, and no areas in the upstairs bedroom had surfaces suitable for latent impressions. The defendant's fingerprints were found nowhere else in the apartment other than on the pane of glass in the kitchen, nor were anyone else's latent fingerprints found in the apartment.

Officer Adams was briefly recalled by the State, following which the State rested. After the defendant's motion for a directed verdict of acquittal was denied, the defense presented its case.

Myrts Yates testified that she lived in apartment No. 6 at 2123 Griswold with her seven children. She sees Mary Jo Watson, who lives in apartment No. 5, almost every day. During the summer of 1979, she also saw the defendant almost every day since the defendant and her son Larry are friends.

Mrs. Yates recalled that during the summer of 1979 on a Sunday, the defendant, her sons Larry and John and Ms. Watson were all drinking together on the porch. On that occasion, Mrs. Yates thought that the defendant had entered Watson's apartment once.

On October 3, 1979, Ms. Watson came by the Yates' apartment and told Mrs. Yates' daughter Brenda to call the police. Brenda called the police and Mrs. Yates went with Watson to Watson's apartment. Earlier that evening, the defendant, Larry Yates, and Henry Joe Pittman were all

at the Yates' apartment. They all left the apartment for a while, but Mrs. Yates did not know if they left together. After the police arrived at Watson's apartment, Larry Yates went over there, as did the defendant and some girl, and Henry Joe Pittman.

Calvin Bonds testified that he resided at 1018 S. Hickory Street but was presently detained at the county jail. Bonds was acquainted with the Yates family, the defendant, and Mary Jo Watson. This is contradicted by Watson who said she did not know anyone named Calvin Bonds. Bonds stated that he had been inside Watson's apartment, including her kitchen, approximately eight times. On approximately five of those occasions, the defendant was with Bonds. Bonds thought that the defendant had entered Watson's kitchen about three times while they were there together.

Bonds also testified that he, the defendant, Joe Pittman and Larry Yates used to socialize in the area around the front and back of the Yates and Watson apartments. The two apartments were only six feet apart in the back, where Watson's kitchen was located.

Bonds stated that on October 3, 1979, the defendant was living with Bonds and Bond's family at 1018 Hickory Street. The defendant was present in the Hickory Street apartment on October 3, 1979, but left there in the evening.

Following Bonds' testimony, the parties stipulated that Mary Jo Watson had been convicted of felony theft in 1979. The defense then rested. In rebuttal, the State offered a stipulation into evidence that Calvin Bonds had been convicted of burglary in 1979.

An instructions conference was held during which the court allowed, over defendant's objections, instructions tendered by the State on defendant's accountability for the conduct of another. Following closing arguments and the giving of jury instructions, the jury returned a verdict finding the defendant guilty of burglary.

This court has recently summarized the law pertaining to the sufficiency of fingerprint evidence to support a conviction.

> "Fingerprint evidence is circumstantial evidence that the defendant committed the crime alleged. (See *People v. Malmenato* (1958), 14 Ill. 2d 52, 150 N.E.2d 806, *cert. denied* (1958), 358 U.S. 899, 3 L. Ed. 2d 148, 79 S. Ct. 222). Circumstantial evidence, in general, is sufficient to support a conviction if it is inconsistent with any reasonable hypothesis of innocence, but the trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *People v. Hancock* (1978), 65 Ill. App. 3d 694, 382 N.E.2d 677; *People v. De Angelo* (1977), 50 Ill. App. 3d 848, 365 N.E.2d 1201.
>
> Because of its established reliability (*Stevenson v. United States* (D.C. Cir. 1967), 380 F.2d 590, *cert. denied*, (1967), 389 U.S. 962, 19

L. Ed. 2d 375, 88 S. Ct. 347) a positive fingerprint comparison may be sufficient to support a conviction (see *People v. Rand* (1975), 29 Ill. App. 3d 873, 331 N.E.2d 15). As a result, where a fingerprint taken from an object at or near the scene of a crime is the only evidence identifying the defendant as the perpetrator, unless the prosecution has established that the fingerprint could have been made only at the time the crime was committed, the defendant can not have been proven guilty beyond a reasonable doubt. (*People v. Donahue* (1977), 50 Ill. App. 3d 392, 365 N.E.2d 710; Annot., 28 A.L.R.2d §28, at 1150 (1953).) This fact can be established by proof of the location of the print or proof of the chain of custody of the object from which the print was taken. (*People v. Donahue* (1977), 50 Ill. App. 3d 392, 365 N.E.2d 710; *People v. Reno* (1975), 32 Ill. App. 3d 754, 336 N.E.2d 36.) Certainly, the relative age of the print would also be a useful fact." (*People v. Van Zant* (1980), 84 Ill. App. 3d 355, 357, 405 N.E.2d 883.)

While the State must prove the defendant guilty beyond a reasonable doubt, there is no requirement that guilt must be proven beyond all possibility of doubt. *People v. Branion* (1970), 47 Ill. 2d 70, 265 N.E.2d 1.

The unexplained presence of a defendant's fingerprint at or near the apparent point of entry is proof of the commission of the offense by the defendant. (*People v. Taylor* (1965), 32 Ill. 2d 165, 204 N.E.2d 734.) If the fingerprint can reasonably be explained by the presence of the defendant in the apartment at some other time (*People v. DiVito* (1966), 66 Ill. App. 2d 282, 214 N.E.2d 320), or if the State has failed to establish that the defendant had not been in the apartment at any time other than at the time of the crime's commission (*People v. Donahue* (1977), 50 Ill. App. 3d 392, 365 N.E.2d 710), or if the State has failed to demonstrate that the subject upon which the fingerprint is found has never been removed from the apartment so that the defendant could not have touched it even though he has never been authorized to enter the apartment (*People v. Van Zant* (1980), 84 Ill. App. 3d 355, 405 N.E.2d 881), the defendant has not been proven guilty beyond a reasonable doubt.

In the case at bar, the State established that the defendant was authorized in the burgled premises only thrice. Once, after the burglary, a police officer did not allow him to enter the kitchen, on another occasion he entered the front door but did not go into the kitchen, and on the third occasion he entered to repair Watson's stereo. After testifying that the defendant had not entered her kitchen at that time, Watson admitted that, because it had occurred so long ago, she could not state for certain under oath that the defendant had not entered the kitchen. Since the testimony of Bonds is inconsistent with that of Watson and since the jury apparently resolved all questions of credibility in favor of the State, we need not now

consider any other possible instances when the defendant might have been in the victim's apartment.

██ It was a question for the jury, therefore, whether the defendant's fingerprints, given their location and demonstrated attitude on a fixed object in the victim's kitchen, notably a shard of glass in the window, would reasonably have been made by the defendant on a visit to the victim's kitchen incidental to his repairing her stereo. Given the location and attitude of the fingerprints, the jury could reasonably find that they could only have been made at the time of the offense even though the defendant might have been in the kitchen once. Therefore, the defendant was proven guilty of burglary beyond a reasonable doubt.

Because the defendant's fingerprints are evidence of the defendant's involvement in the commission of the burglary, we need not consider the defendant's contention that his guilt was one of mere association by reason of his friendly relationships with Pittman, whom the defendant admitted seeing in the area of Watson's apartment while carrying a large object, and Larry Yates, who returned the victim's television the day following the burglary. As for the second issue, we find no error requiring reversal as a result of the giving of an instruction on accountability. It is the defendant's contention that if the evidence established entry into Watson's apartment with the requisite, accompanying intent to commit a theft therein, the defendant would be guilty of burglary as a principal and not as an accessory or accomplice. This court has noted that, as a general rule, instructions on principal and accountability theories may be given where both theories are supported by the evidence. (See *People v. Lusietto* (1976), 41 Ill. App. 3d 205, 353 N.E.2d 385.) However, we also determined in that case that an accountability instruction ought not to be given where the evidence establishes the defendant as a principal and not an accomplice, as where the defendant was found in the burgled premises.

██ The defendant in the instant case was not, however, discovered within the burgled premises. Even slight evidence of accountability is sufficient to justify the giving of the instruction, even though the defendant might also be found guilty as a principal. (*People v. Thomas* (1979), 72 Ill. App. 3d 28, 389 N.E.2d 1316.) For example, where a defendant kicks in a window, the evidence is sufficient to demonstrate not only that he committed burglary as a principal, but also that he aided and abetted a nearby crowd of looters in perpetrating burglary. *People v. Roldan* (1968), 100 Ill. App. 2d 81, 241 N.E.2d 591.

██ From the facts in this case, the jury could reasonably infer that the defendant acted as a principal in committing the burglary or that he was at the scene of the crime aiding and abetting others. The fact that one of his friends, admittedly, was carrying a large object from the area and another friend returned the television the next day, tends to support an

accountability theory. In any event, courts which have considered this issue have found any resultant error to be harmless. (*People v. Finch* (1946), 394 Ill. 183, 68 N.E.2d 283; *People v. Lusietto* (1976), 41 Ill. App. 3d 205, 353 N.E.2d 385; *People v. Umphers* (1971), 133 Ill. App. 2d 853, 272 N.E.2d 278.) As a result, we find no reversible error in the giving of the instruction on accountability.

For the foregoing reasons, the judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

STENGEL and SCOTT, JJ., concur.