(No. 34539.—

The People of the State of Illinois, Defendant in Error, *vs.* Michael Malmenato, Plaintiff in Error.

*Opinion filed May 21, 1958—Rehearing denied June 18, 1958.*

MYER H. GLADSTONE, of Chicago, and HENRY D. FISHER, of Waukegan, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and THOMAS J. MORAN, State's Attorney, of Waukegan, (FRED G. LEACH, WILLIAM H. SOUTH, and KENNETH SHORTS, of counsel,) for the People.

MR. CHIEF JUSTICE DAVIS delivered the opinion of the court:

The defendant, Michael Malmenato, was convicted by a jury in the circuit court of Lake County of the crime of attempted burglary, and sentenced to serve a term of not less than three nor more than five years in the penitentiary. By writ of error he seeks to reverse the judgment of conviction. The errors assigned relate to the admission of evidence, its sufficiency to convict, the giving and refusal of instructions and the failure of the circuit court to withdraw a juror and declare a mistrial because of the publication of a certain newspaper article during the trial.

The evidence for the People established that on August 19, 1955, the Evans Garden and Pet Supply Store, herein called the store, was located on Central Avenue in High-

land Park, Lake County, in a one-story brick building with a skylight, the glass portion of which was elevated above the roof surface. The residence of John Sweeney abutted an alley which led to the rear of the store. At about 9:30 P.M. on the date in question, he saw three men walk up the alley in the direction of the store. It was dark at the time, but the men passed within 25 feet and he saw that they wore light-colored shirts and that one of them was carrying something. In a short time, he heard noises emanating from the vicinity of the store which sounded like someone tearing up boards or iron, saw rays of light on the roof which appeared to come from flashlights, and he called the police.

Paul J. Kaehler, the first officer to arrive, parked his patrol car in front of a house next door to the store and walked up the alley to the rear of the building. As he approached the southeast corner of the store he saw one man on the roof, one on the ground, and another climbing down the drainpipe from the roof to the ground. As the last man descended, Kaehler flashed his light and ordered them to stop, but all fled. Two men ran down the alley to the west and the third jumped a fence and ran to the north. The officer fired a warning shot but did not pursue them. He observed that all were wearing light-colored shirts. After the chief of police, officer Mario Marchi, and other officers arrived at the scene, they went to the roof of the store building, discovered that a strip of metal had been torn from the skylight, and found a crowbar 18 inches in length. About six feet east of the store, they found a ten-pound sledge hammer.

Officer Marchi then drove around the neighborhood in a patrol car looking for suspects. At about 10:20 P.M., while proceeding in a westerly direction about ¼ mile west of the store, he saw a man, about 25 feet from the roadway, who was crouched down in some bushes which were about four feet high. He stopped the car and ordered the man to come out with his hands up. As the man approached

the car, he stated that he had been looking for an officer, and Marchi replied: "That makes it even. I am looking for you." Marchi testified that this man, later identified as the defendant, was wearing a light-colored sport shirt which was stained as though from green foliage; that there were scratches on his face and arms and one hand was bleeding; that he told the defendant that he was suspected of an attempted burglary, searched his person, but found nothing; and that defendant stated to Marchi that he had been thrown out of a car just prior to his arrest, while trying to hitch-hike a ride to Milwaukee. The officer then took defendant to the police station where he was locked up. Defendant gave his name and address, but made no further statement.

About daybreak, on August 20, officer Marchi returned to the place of the attempted burglary. He found a pair of cotton gloves in the alley near the fence, and a nickel-plated flashlight in the backyard of the house next to the store, and about 100 feet west of it. Northwesterly about 150 feet from the store and in the front yard of the next residence, he found a brass flashlight, two pair of cotton gloves and a screwdriver. A loaded revolver was found 200 feet further west on Central Avenue. Except for the gloves, Marchi did not touch any of these articles, but lifted them with a wire, placed them in a box, took them to the police station and turned them over to the chief of police. Marchi testified that such items were kept in a special room accessible only to the chief of police and police captain Earl Lampinen.

Ray Lange, a police sergeant who came on duty at about midnight following defendant's arrest, took the defendant's fingerprints, which impressions were made on a card signed by the defendant and him. Captain Lampinen came on duty at 11:00 A.M. on August 20, went to the special room and observed the articles which Marchi had recovered, lifted them with a wire and laid them on a table

where he dusted them for latent fingerprints. The revolver and nickel flashlight were negative, but the brass flashlight produced a latent print which was lifted by tape in the usual manner and later photographed. This was compared with the fingerpints taken from the defendant. At the trial both Lampinen and a fingerprint expert from the Bureau of Identification of the Chicago Police Department testified that the latent print taken from the flashlight was identical with the print of the middle finger of defendant's left hand.

The defendant testified in his own behalf and denied that he participated in any way in the attempted burglary. He gave his address as 1658 W. Ohio Street, Chicago, and stated that he usually helped his father who operated a fruit and vegetable business, but had not worked on August 19 because of a headache. He further testified that he arose at about 1:00 P.M. on that date, had breakfast and then went by bus to a forest preserve located 10 or 12 miles northwest of his home; that he remained there until about 7:30 P.M. when he went to the northwest corner of the intersection of Milwaukee and Devon avenues to board a bus to go home; that he saw no bus, decided to thumb a ride, and was immediately picked up by a two-door car; that the person in the front seat on the right side got out and entered the rear seat; that he got into the car and sat in that part of the front seat; that the car had proceeded only half a block when he felt something cold on his neck and was ordered by the person in the rear seat to get down; that he complied and lay on the seat with his feet toward the side of the car and his head toward the driver; that the person in the rear seat went through his pockets and removed his wallet; that he did not know how long they drove or where they went but eventually he was shoved out of the car while it was in motion; that he was somewhat dazed from the fall and the next person he saw was officer Marchi; that he was not crouching in the bushes,

but was walking along the road when the officer drove up; that as Marchi stopped, he walked over to the automobile, stuck his head in the door and said: "Maybe you are the one I am looking for, you could help me out"; that Marchi then said: "That's funny, I have been looking for you," and immediately began to question him about a robbery; and that he told the officer that he had been robbed and thrown out of a car, but Marchi refused to believe him, took him to the police station and locked him up.

Defendant further stated that three or four hours after he had been locked in a cell the police sergeant took him to another room and fingerprinted him, then put him back in the cell; that at "about daybreak" someone awakened him, handed him a flashlight and said: "Did you ever see this flashlight?" and that he replied that he had seen a lot of flashlights but not that one. On cross-examination he stated that he didn't know the person who handed him the flashlight; that "I grabbed it with my right or left hand; it could have been either one;" and that he held it only a few seconds.

While the evidence against the defendant was circumstantial in nature, it was sufficient to establish his guilt beyond a reasonable doubt and justify a verdict of guilty, unless explained by other evidence or facts and circumstances which would raise a reasonable doubt of his guilt. Defendant was found in the immediate vicinity of the attempted burglary within an hour of its commission under circumstances which were highly suspicious. The scratches on his arms and face and the stains on his light-colored sport shirt were consistent with the belief that he was one of the men who hastily fled from the scene of the crime. If officer Marchi's testimony was credible, defendant, at the time of his apprehension, was found crouching in the bushes adjacent to the roadside, far from his Chicago home and in a neighborhood where he had no apparent business or pleasure purpose. It is uncontradicted that flashlights

were used in the attempted burglary and that defendant's fingerprint was on the flashlight which was found in the path of the felons' flight, about 150 feet west of the store. This was evidence of the highest character and positively connected the defendant with the crime.

Counsel argued, however, that defendant told a reasonable story to explain the presence of his fingerpint on the flashlight; that his account was not denied by any of the officers; and that the evidence as a whole was insufficient to establish guilt because the presence of the fingerprint was consistent with defendant's innocence. This argument is based upon the false premise that the jury, in the absence of a denial by the officers, were bound to believe the defendant's testimony. When a defendant elects to testify in his own behalf, his credibility is to be tested by the usual rules applicable to other witnesses. In determining the credibility of a witness, including a defendant, the jury may take into consideration, among other things, the probability or improbability of the truth of his statements in the light of human experience. (*People* v. *Surace,* 295 Ill. 604; *Chambers* v. *People,* 105 Ill. 409.) The jury are not entitled to disregard the accused's testimony merely because he is the defendant in the case, but it may consider his interest in the result of the trial in weighing his testimony. (*People* v. *Meyer,* 331 Ill. 608; *People* v. *Surace,* 295 Ill. 604.) If the testimony of the defendant is so unreasonable as to be judged improbable, or, in the absence of contradictory evidence, so remarkable as to almost seem incredible, the jury may reject it. *People* v. *Jordan,* 4 Ill.2d 155; *People* v. *Meyers,* 412 Ill. 136; *People* v. *Uher,* 375 Ill. 499.

The jury could have found the defendant's story concerning the flashlight incident so inherently improbable as to render it unworthy of belief. In order to give it credence the jury had to believe that someone connected with the police department was either extremely careless or sought to perpetrate a fraud. Anyone with police experience would know

that fingerprints on the surface of the flashlight would be smudged or obliterated by touching. This possibility would be greatly increased if both an officer and the defendant took hold of the flashlight as defendant testified. In view of the uncontradicted testimony of the officers relative to the care used in picking up the flashlight, we cannot believe that any of them would handle it in the manner described by defendant. The only alternative is to believe that an officer deliberately sought to trap the defendant into holding the flashlight in order to secure evidence for his conviction. There is nothing in this record which would warrant that conclusion, or indicate that any officer involved in this case was actuated by improper motives. In the absence of such evidence, neither the jury nor this court would be justified in believing that the members of the police department resorted to trickery to obtain a conviction.

Defendant's testimony is not only inherently improbable, but is also vague and unsatisfactory. He made no attempt to describe the person who he said came to his cell with the flashlight. He stated that he "took it for granted" the person was a police officer, but did not know who he was. He did not testify that the flashlight which was handed to him was the exhibit from which the fingerpint was taken and, while he is right handed, he did not remember whether he took it in his right or left hand. The jury were entitled to consider all of this testimony, as well as the defendant's narration of his abduction and robbery which attempted to account for his presence in the neighborhood. It can fairly be said that his testimony concerning his abduction was not only unconvincing and unsatisfactory, but, like his testimony concerning the flashlight, was also vague and fraught with improbability.

The defendant did not have the burden of proving his innocence, but, having elected to explain his presence in the locality and his fingerprint on the flashlight, it was incumbent upon him to tell a reasonable story or be judged

by its improbabilities. (*People* v. *Meyers*, 412 Ill. 136.) Where the evidence is conflicting, the credibility of the witnesses and the weight to be given their testimony is a question for the jury, and this court will not substitute its judgment for that of the jury or the trial court. *People* v. *Hinderhan*, 405 Ill. 435; *People* v. *Smith*, 391 Ill. 172.

Defendant complains of an instruction given to the jury at the request of the People in which reasonable doubt was defined in both positive and negative terms, and which stated, *inter alia*, that "reasonable doubt does not mean the possibility that the accused may be innocent." It was obviously framed from a similar instruction approved by this court in *People* v. *Lucas*, 244 Ill. 603, and may be distinguished from the instructions involved in *People* v. *Rosenberg*, 267 Ill. 202, and *People* v. *Fox*, 269 Ill. 300, relied upon by defendant, in which this court held the instruction erroneous. Reasonable doubt is a term which needs no elaboration and we have so frequently discussed the futility of attempting to define it that we might expect the practice to be discontinued. (*People* v. *Schuele*, 326 Ill. 366; *People* v. *Rogers*, 324 Ill. 224.) Nevertheless, both the People and the defendant tendered instructions attempting to define or qualify the term. However, upon careful consideration of the questioned instruction, we find it free from prejudicial error. Cf. *People* v. *Maffioli*, 406 Ill. 315.

Defendant urges that the court erred in refusing to give his instruction No. 26, which stated that if there were two reasonable theories which might arise from the evidence, one pointing to his guilt and the other to his innocence, the jury should adopt the theory consistent with innocence and acquit him. The trial court held that this instruction was not applicable under the facts and we agree. Such an instruction is proper only when opposing theories of guilt or innocence arise out of the same facts. (*People* v. *Maffioli*, 406 Ill. 315.) In this case the theories of the defense and prosecution arise out of unrelated facts. In its essence,

defendant's theory is in the nature of an alibi, as in *Maffioli*. Defendant would have the jury believe that at the time the crime was committed, he was being driven about in an automobile by his abductors and therefore was not a participant. Under these circumstances, the instruction was properly refused.

Defendant urges that the burglary tools, including the hammer, crowbar, flashlights and revolver should not have been admitted in evidence because there was nothing to connect them with him. This ignores the presence of defendant's fingerprint on one of the exhibits. All of these items were found in the immediate vicinity of the attempted burglary, and in the general area in which the defendant was arrested. They were competent to prove the *corpus delicti* of the crime of attempted burglary and their connection with the accused was sufficiently established. The presence of the gloves indicates that some care had been taken to avoid leaving fingerprints which explains their absence from many of the items.

Defendant also complains that witnesses for the prosecution were allowed to make many incompetent and prejudicial statements against him. However, the record reveals that such remarks or statements were few in number, not of a prejudicial character, and that the court sustained objections to such remarks and ordered them stricken. The record fails to reveal any calculated attempt to deprive the defendant of a fair trial and establishes that the trial court at all times zealously guarded the rights of the accused even to the extent of denying the admission of a certain purported conversation between defendant and Captain Lampinen which in our opinion was competent.

Defendant also contends that his right to a fair trial was seriously prejudiced by a brief article in the Waukegan News-Sun on the morning of the second day of the proceeding which, after stating that the case had gone to trial

and naming the counsel involved, concluded: "Malmenato reportedly has a record of 43 arrests and no convictions."

At the close of the first day, the judge admonished the jurors not to discuss the case among themselves or with anyone and specifically asked them to refrain from reading any newspaper article which might appear concerning it. On the following morning, defense counsel made an oral motion to withdraw a juror and declare a mistrial, based on the publication of this news item. The court interrogated the jurors and found that only one of them had read it; stated regret that the instruction of the court had been violated; admonished the juror that nothing he had read was evidence against the defendant; stated that the item should not be discussed with other juors and should not influence him in his deliberations; and asked the juror whether he thought he could still be a fair and impartial juror in the case. The juror replied in the affirmative stating: "It didn't have that much effect on me." The motion was thereupon denied.

Such motion is addressed to the sound discretion of the trial court. (*People* v. *Mangano*, 354 Ill. 329.) The exercise of that discretion is always subject to review and its abuse will constitute reversible error. (*People* v. *Hryciuk*, 5 Ill.2d 176; *People* v. *Murawski*, 394 Ill. 236.) The question presented is whether the jurors, or any of them, have been influenced and prejudiced to such an extent that they would not or could not be fair and impartial, and each case must be determined on its own peculiar facts and circumstances. (*People* v. *Gambino*, 12 Ill.2d 29; *People* v. *Rogers*, 303 Ill. 578.) The statement of a juror that he has read but was not influenced by the article is not conclusive, and due consideration must be given to the nature and character of the statements themselves. (*People* v. *Hryciuk*, 5 Ill.2d 176.) Noteworthy among the cases in which this court has found prejudice to exist are *People* v.

*Kenzik,* 9 Ill.2d 204; *People* v. *Hryciuk,* 5 Ill.2d 176, and *People* v. *Murawski,* 394 Ill. 236; all cited by defendant. In *Murawski,* an abortion case, the article stated that defendant had been twice indicted for abortion and once for murder by abortion but had never been brought to trial. In *Hryciuk,* where the charge was forcible rape, the article stated that defendant had confessed to two murders for which the State planned to try him and ask the death penalty; that he had boasted of attacks on more than fifty women and was described by the police as a vicious degenerate. In *Kenzik,* a murder case, the news item stated that defendant, who had fled following the slaying of his wife, had a long criminal record and had been named by the Federal Bureau of Investigation as one of its ten most wanted men. In all of these cases the information in the article was attributed to the State's Attorney's office and there were facts which led this court to believe that a number of the jurors had read the items and had been influenced thereby. In *Kenzik,* it appeared from the evidence introduced in support of a motion for new trial that at least three of the jurors had read the account and discussed it among themselves, and the foreman stated that he and the others could not keep the article out of mind while they deliberated.

There is nothing in the present case to indicate that the jurors may have discussed the questioned article among themselves. The article was inadvertently read by one of the jurors who stated that its contents would not prevent him from being fair and impartial. He was solemnly admonished by the court not to mention it to the other jurors and all jurors were then reminded that nothing appearing in a newspaper could be considered as evidence in the case. At the conclusion of the case, the jurors also received a written instruction to this effect. Under the circumstances we cannot say that the court abused its discretion in denying the motion to withdraw a juror. An accused is entitled

to a fair trial and his rights must be zealously guarded by court and counsel, but a reversal is not indicated merely because a newspaper prints some statement derogatory of the defendant during the trial. To warrant a reversal, it must reasonably appear that the jurors, or at least some of them, have been influenced or prejudiced to the extent that they cannot be fair and impartial. Such evidence is lacking in this case.

The judgment of the circuit court of Lake County is affirmed.

*Judgment affirmed.*