748 A.2d 1050 (2000)
131 Md. App. 242
Jermaine Stelwagen WRIGHT
v.
STATE of Maryland.
No. 270, Sept. Term, 1999.
Court of Special Appeals of Maryland.
March 30, 2000.
Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.
*1051 Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Joel Todd, State's Atty. for Worcester County, Snow Hill, on the brief), for appellee.
Submitted before DAVIS, KENNEY, and JAMES S. GETTY (retired, specially assigned), JJ.
DAVIS, Judge.
Jermaine Stelwagen Wright, appellant, was convicted by a jury in the Circuit Court for Worcester County (Groton, J.) of first degree murder, robbery, sodomy, assault and battery. He was sentenced to a term of life imprisonment for the murder conviction, a consecutive term of fifteen years imprisonment for the robbery conviction, and a consecutive term of ten years imprisonment for the sodomy conviction. The sentences for the assault and battery convictions were merged. Appellant presents one question on appeal:
Did the trial court err in denying his motion for a mistrial after the jury read two newspaper articles about him which contained prejudicial material?

FACTS[1]
On June 14, 1995, sixteen-year-old Krista Ruggles and her friend, Tera Charles, went to the Night-Light Under Twenty-One Dance Club (Night-Light) in Ocean City, Maryland. Ruggles, a Pennsylvania resident, was in Ocean City for "June week." While Ruggles and Charles were at the club, appellant approached Ruggles and danced with her. After the girls left the club, they walked northward on the boardwalk. At 15th Street, they saw appellant. Appellant offered them a ride to their hotel. The girls accepted and appellant drove them to the Dunes Manor Hotel, where Ruggles was staying. He told the girls that his name was Jermaine. They reached the hotel at approximately 3:45 a.m. At the hotel, appellant told Charles that he wanted to talk to Ruggles for ten minutes. Over Charles's objections, Ruggles agreed to talk to appellant. She told Charles she would be in the hotel room in ten minutes. Charles watched appellant and Ruggles drive off, and saw appellant turning west on 29th Street. Ruggles had her purse with her.
Charles waited for Ruggles in the hotel lobby. At 4:00 a.m., Charles went outside and looked for Ruggles, but did not see her. Charles waited in the lobby until 5:30 a.m., then went to Ruggles's room. Ruggles did not return. Later that morning, Charles filed a missing persons report with the police.
Whaleysville is a village located between Ocean City and Salisbury. On June 19, 1995, a woman who was biking on Fooks Road near Whaleysville noticed something pink approximately twenty-five feet off the road. Closer inspection revealed the body of a teen-aged girl. The body was subsequently identified as that of Krista Ruggles.
The area where Ruggles's body was found was located approximately ten to fifteen miles west of Ocean City and fifteen to twenty miles east of Salisbury. The area was "a couple of miles" from Route 50. David Collins, a forensic investigator with the Maryland Medical Examiner's Office, stated, however, that "it's not a straight shot" from Route 50, and that one would have to "go up and around" to get to that location.
An autopsy was performed on June 20, 1995. Dr. David Fowler, the assistant medical examiner, estimated that Ruggles had been killed between three days to one week previously, with four days previously being the most likely time of death. He determined that death had been caused by manual strangulation and blunt force injuries to the head. He stated, however, that *1052 the primary cause of death was manual strangulation. Fowler further stated that toxicology tests performed on the body were consistent with an ejaculation of prostatic fluid in or near the anus.
Corporal Robert McQueeney of the Maryland State Police interviewed appellant on June 20, 1995. Appellant told Corporal McQueeney that he lived with roommates and his girlfriend in Salisbury. Appellant told Corporal McQueeney that, on the night of June 14, 1995, he was in Ocean City. Appellant said that he had walked to his aunt's house and borrowed her car. He told Corporal McQueeney that he had $5 on him, and that he had bought a "deuce" of beer with some of the money.
During the interview, appellant stated that he had been to the Night-Light dance club that night and had danced with Ruggles. He acknowledged that, sometime around 3:00 a.m. or 3:30 a.m., he had given Ruggles and Charles a ride to their hotel.
Initially, when Corporal McQueeney asked appellant what had happened, appellant told the corporal that he had dropped both girls off at their hotel and that they went inside. When Corporal McQueeney asked again what had happened, appellant said that Ruggles had said that she wanted to talk to him, and her friend said that she would meet Ruggles in the room.
According to Corporal McQueeney, appellant told him that they talked for a while, then went to the McDonald's restaurant at 32nd or 33rd Street. Corporal McQueeney stated that appellant told him at one point that they had driven around for about ten minutes first, and at another point, he had said that they went directly to the McDonald's.
The corporal testified that appellant also told him the following: there were people going inside and out of the McDonald's, and he waved to people although he did not know any of them. Ruggles exited the car and saw a man named Brian, whom she knew from Pennsylvania. Ruggles spoke with Brian, a black man, slim, about six feet tall. Appellant waited for about fifteen minutes.[2] Ruggles gave Brian the name of the motel and her room number, and told him that she could meet him on the beach. Appellant then left the McDonald's and went home.
Corporal McQueeney testified that appellant told him that he "went back down Coastal, he rode around the inlet, up Coastal, back past McDonald's, he took Coastal to 73rd Street," then he took Maryland Routes 90 and 50 home. The corporal testified that appellant told him that he had stopped at a 7-Eleven and bought gas, took his aunt's car to her house, and then took a cab to his home.
According to Corporal McQueeney, appellant told him that he had wanted Ruggles to buy him something to eat and to buy gas. The corporal stated that appellant told him he did not have sexual intercourse with Ruggles because "he was just going to wait, it was too late to try anything." Corporal McQueeney also testified that appellant "bragged that he could sell anyone anything and that he ripped people off at work.
Anthony Hasting, the manager of the McDonald's restaurant at the time of the incident, testified that the McDonald's restaurant closed and the doors were locked at 2:00 a.m. He testified that, if anyone was outside the building after the doors were locked, the police would be called to remove them. Hastings further testified that the drive-in window was closed at 3:00 a.m.
John Dolch, an employee at the Eastern Correctional Institution, and appellant's former high school wrestling coach, visited appellant in jail on June 20, 1995. Dolch wore a body wire for the State Police. Dolch asked appellant what had occurred *1053 between him and Ruggles. Dolch testified that, to his recollection, appellant told him that Ruggles had gone inside the McDonald's restaurant and that she was talking to a white man named Brian there. During cross-examination, defense counsel and Dolch read a portion of the transcript of the conversation between Dolch and appellant. The transcript revealed that appellant had not said that Ruggles had gone inside the restaurant, but that he said she spoke to a man named Brian in the parking lot. The transcript indicated that appellant had, in fact, told Dolch that Brian was white.
Antonio Lewis testified that he had been appellant's cellmate at the Worcester County Jail. According to Lewis, one day shortly before appellant's trial, appellant told him that he was angry with his attorney because his attorney wanted him to take a judge trial instead of a jury trial. Lewis testified that appellant "just started talking" and that appellant told him that he had been with "the girl" that night, that they had gotten into an argument, and that she would not get out of the car. According to Lewis, appellant told him that,
once he went to drop her off, they got into an argument and fussing and fighting, and she wouldn't get out, he said he just pulled off. And he didn't say directly where they went at, [sic] but he said they got there, he stopped the car and they continued to fuss. And he said he smacked her.
Appellant also told Lewis that, after he "smacked" the girl, "It just happened." When Lewis asked appellant, "What happened?" appellant "just looked at [him] and said, `It happened.'" Lewis further testified that appellant told him that he had driven around until he could figure out what to do, and that he was late getting home.

THE PROCEEDINGS
Prior to trial, appellant made a motion in limine to preclude disclosure to the jury of the fact that appellant had previously been convicted of sodomy and to preclude evidence of other bad acts, "such as bruises and rough treatment of his prior girlfriends." The State did not oppose the motion, and the trial court granted it. Apparently, as exhibits to the motion, appellant submitted newspaper articles.
The first article reported that appellant had been arrested and charged with the murder, but that because of a lack of evidence, the State's Attorney had dropped the charges in January 1996. The article then recounted appellant's criminal history. It stated, in pertinent part:
In May 1997, [appellant] was working for [a pool] company in Greensboro, N.C., when he was charged with two counts of statutory rape and indecent liberties with a child after allegedly raping a 15-year-old girl in his apartment there.
Wright was found guilty in January 1998 of the indecent liberties charge, a felony in North Carolina involving lewd and lascivious acts on a person under the age of 16. The jury could not agree on a verdict for the rape charge.
The assistant district attorney planned to try him again on that charge, but a plea bargain was reached and Wright pleaded guilty to two more counts of indecent liberties with a child. He was sentenced to a minimum of 57 months and a maximum of 69 months in prison.
In addition to the North Carolina conviction, Wright has previous convictions for a fourth-degree sex offense in 1993 and for a perverted sex practice in 1994. In the 1994 case, he allegedly grabbed a girl by the throat and demanded sex at her home in Salisbury. He was charged with rape, sex offense by suffocation and numerous other sexual charges, but was only found guilty of the perverted practice charge and sentenced to one year in jail.
*1054 The article then stated that appellant was again indicted on the current charges in September 1997 and set forth the charges against him.
The second article stated that appellant had previously been charged with the crimes for which he was being tried, but that the charges had been dropped at that time because of insufficient evidence. The article stated, in part:
[Appellant's] attorney, W. Burton Anderson, is expected to ask the judge to suppress references to [appellant's] criminal history or his relationships with former girlfriends.
The trial proceeded against appellant and, the jury, in due course, retired to deliberate. At some point during the deliberations, the jury sent the trial court a note asking, "Would the jury be wrong to consider Defendant's Evidence 1 and 2 in this case?" The exhibits referred to were two newspaper articles about appellant.
The trial court had the jury return to the courtroom. Upon their return, the trial court stated:
Ladies and gentlemen, the reason that I brought you back into the courtroom is because I received a note which indicated "Would the jury be wrong to consider Defendant's evidence 1 and 2 in this case?" 1 and 2 obviously were newspaper articles that were inadvertently sent back to the jury room. They were marked as Defendant's 1 and 2 in a pretrial hearing, were not admitted into evidence in this particular case, and should not have been sent back to the jury room.
What I need to do at this time is to find out whether, in fact, anybody on the jury read the substance of the articles. If you did, please raise your hand.
The trial court noted that every juror had read the articles. In response to a question by the trial court, the jury foreman told him that they had read the articles individually. The following then occurred:
THE COURT: Well, what I'll do is this, as I just indicated, you all understand that these arewhat is contained in these articles are not evidence in this case. They should not be considered in any fashion, in any manner whatsoever by you all in arriving at your decision.
They should not be discussed and they can't be considered.
Do you all understand that?
JURY ARRAY: (Answering in the affirmative).
THE COURT: What I am going to do is ask each individual juror whether they [sic] are going to be able to continue on with their deliberations, put what they read in these articles out of their mind, and make their decision based solely on the evidence that is presented in the courtroom.
The trial court proceeded to ask each juror whether he or she could do so. Each juror replied that he or she could. The State's Attorney requested the trial court to further instruct the jury to report any attempted discussion of the articles. The following occurred:
THE COURT: Mr. Taylor, as foreperson there's been a request. You all have represented that you won't consider any substance of these articles and won't discuss it. If, in fact, for some reason a juror does bring it up and wishes to discuss it, if you would notify me by note, I would request that you do that.
THE FOREPERSON: Your Honor, when I discovered it, I said I don't think we should be discussing this anymore, and we stopped at that point. We never discussed it to start with. We were just amazed to see it.
The jury then returned to their deliberations. Defense counsel requested a mistrial. The trial court responded to the request by stating:
Well, I am impressed by the fact that they notified us that they had them, and *1055 therefore, probably realized it was improper, something that they shouldn't consider.
Based on that, they notified the [c]ourt. And I found them to be believable when they said that theyeven though they read them, they would not consider them, they would decide the case only on the testimony and evidence presented in court.
For that reason, I will deny your motion for a mistrial.
The jury subsequently found appellant guilty of all charges. The record does not indicate how long the jury deliberated after reading the articles. However, when the jury announced that it had reached a verdict, the judge thanked the alternates for their patience, noting that they had sat in the conference room "for these last four or five hours."

DISCUSSION
Appellant contends that the trial court erred in denying his motion for a mistrial. Quoting from Rainville v. State, 328 Md. 398, 410, 614 A.2d 949 (1992), he contends that the impact of appellant's history of crimes involving rape and choking of young girls "almost certainly had a substantial and irreversible impact upon the jurors, and may well have meant the difference between acquittal and conviction." He further contends that the prejudice resulting from the jurors' knowledge of his prior convictions could not be overcome by the curative actions of the trial court. The State, on the other hand, contends that appellant has not demonstrated prejudice and that no mistrial was warranted.
A mistrial is "an extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice." Burks v. State, 96 Md.App. 173, 187, 624 A.2d 1257, cert. denied, 332 Md. 381, 631 A.2d 451 (1993).
Whether to grant a mistrial is a decision vested in the sound discretion of the trial judge, who can best weigh the danger of prejudice arising from any alleged impropriety within the context of the entire case, and who is, therefore, in the best position to determine if a mistrial is warranted.
Stewart v. State, 334 Md. 213, 220, 638 A.2d 754 (1994). We will not reverse a trial court's denial of a motion for mistrial unless the defendant was so clearly prejudiced that he or she was denied a fair trial. Guesfeird v. State, 300 Md. 653, 659, 480 A.2d 800 (1984).
The fundamental rationale in leaving the matter of prejudice vel non to the sound discretion of the trial judge is that the judge is in the best position to evaluate it. The judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his [or her] finger on the pulse of the trial.
State v. Hawkins, 326 Md. 270, 278, 604 A.2d 489 (1992).
The potency of the Sixth Amendment right to a fair trial relies on the promise that a defendant's fate will be determined by an impartial fact finder who depends solely on the evidence and argument introduced in open court. Indeed, the notion that a jury's verdict shall be based exclusively on the evidence offered at trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury.
Allen v. State, 89 Md.App. 25, 42, 597 A.2d 489 (1991), cert. denied, 325 Md. 396, 601 A.2d 129 (1992) (citations omitted).
In Maryland, when a party alleges that he or she was denied a fair trial by virtue of a newspaper article, the party must show that: (1) the newspaper articles were prejudicial, (2) a juror read the prejudicial article, and (3) the juror's decision was influenced by the newspaper article. *1056 Presley v. State, 224 Md. 550, 555, 168 A.2d 510 (1961), cert. denied, 368 U.S. 957, 82 S.Ct. 399, 7 L.Ed.2d 389 (1962). In the present case, it is clear that the articles were read by the jury. The State contends, however, that appellant was not prejudiced by the jurors having read the articles and that their decision in the present case was not influenced by the articles.
Several courts have considered, with varying conclusions, the effect of jurors having read newspaper articles regarding cases over which they presided. One annotator has commented:
It has been stated that the test in determining whether a new trial, mistrial, or reversal should be granted in a criminal action upon a showing that the jurors have read newspaper accounts of the trial depends upon whether or not a fair trial, under the circumstances, has been interfered with. There is not one rule, however, which defines just what does or does not so interfere. The inquiry, therefore, must center primarily around the facts in each case, and the ultimate decision rests in the sound judicial discretion of the court.
Andrea G. Nadel, Annotation, Juror's Reading of Newspaper Account of Trial in State Criminal Case During its Progress as Ground for Mistrial, New Trial, or Reversal, 46 A.L.R.4th 11, 23 (1986).
Courts that have been faced with this issue have considered several factors in determining whether exposure to newspaper accounts have interfered with a defendant's right to a fair trial. These factors include the nature of the information and the actions of the trial court in minimizing the effect of the unauthorized information. At least two courts have suggested that a juror's failure to heed the admonition of the trial court not to read articles about the case indicated a lack of responsibility on the part of the juror. Other courts have considered the strength of the other evidence against the defendant in determining whether a jury was influenced by prejudicial extraneous information. In addition, we have also opined that the number of jurors who learn of the extraneous information should be considered in determining whether a defendant's right to a fair trial has been compromised.
A. The Nature of the Information
We do not read the State's brief as seriously suggesting that the information of appellant's prior convictions and the prior allegations against him were not prejudicial, but rather that the jurors were not influenced by it. We agree with the United States Court of Appeals in United States v. Williams, 568 F.2d 464 (5th Cir. 1978), that "news stories published during the trial that reveal to jurors a defendant's prior criminal record are `inherently prejudicial.' " Id. at 569 (citation omitted). We also note that the judge considered the information sufficiently prejudicial as to warrant his granting a motion in limine to exclude it from evidence at trial. As will be seen infra, the cases generally consider such information to be prejudicial, the question being whether, under the circumstances, the prejudice can be overcome by the actions of the trial court.
1. Requiring Reversal of Conviction
Several cases dealing with the effect of one or more jurors learning of a defendant's prior convictions have held that the nature of the information interfered with the defendant's right to a fair trial.
One such case is Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). There, the United States Supreme Court considered the defendant's conviction of dispensing drugs without a license. During the trial, jurors were exposed to two newspaper articles. One stated that the defendant had two prior convictionsone for forgery and one for practicing medicine without a proper license. The other article said that the defendant had been identified as the individual who had "acted as a physician and prescribed restricted drugs for Hank *1057 Williams," and that the defendant had previously been convicted of forgery. The newspaper article also stated that the defendant's wife had already been convicted of the drug charges. Three jurors read the first article, one juror read both, two jurors had "scanned" the first article and one juror had scanned both. The defendant moved for a mistrial based on the jurors having read the articles.
The United States Supreme Court reversed the conviction. It acknowledged that "[t]he trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial." Id. at 312, 79 S.Ct. 1171 (citation omitted). It stated, however, that each case must be decided on its own facts. Id. It noted that the information received by the jurors was so prejudicial that it could not be offered as evidence. It then concluded that, under the circumstances presented there, a new trial was appropriate. Its decision, however, was based not on a constitutional ground, but on the Court's supervisory function over the federal courts.
A similar result was reached in People v. Holloway, 50 Cal.3d 1098, 269 Cal.Rptr. 530, 790 P.2d 1327 (1990), overruled on other grounds, People v. Stansbury, 9 Cal.4th 824, 38 Cal.Rptr.2d 394, 889 P.2d 588 (1995). In Holloway, the defendant had been convicted of murdering two sisters in their townhouse, and of burglary and attempted rape in connection with that incident. During the second day of trial, one of the jurors read a newspaper article which stated that the defendant had been convicted of assaulting a woman with a hammer and was on parole from prison. The juror did not inform anyone that he had read the article, and his misconduct was not learned until after the verdict had been rendered.
In assessing the necessity of a new trial, the California Supreme Court stated the "well settled" rule that "such juror misconduct raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted." Id. at 1332 (citations omitted). Finding no factor to rebut that presumption, the court reversed the defendant's conviction.
In State v. Roman, 473 So.2d 897 (La. Ct.App.1985), the Louisiana Court of Appeal reversed the defendant's conviction of forcible rape and aggravated crime against nature. On the day the jury was selected, the local newspaper published an article about the defendant. The article stated, inaccurately, that the defendant was being tried for robbery. The article also stated that the defendant was serving a prison sentence for rape and robbery, and that he was serving time "`in connection with a related "crime spree", [sic] which included a couple of other assaults and robberies.'" Id. at 899. The article further stated that the defendant was arrested for rape and robbery once in May and twice in June of the previous year. The trial judge had neglected to instruct the jury not to read, listen to, or watch any news account of the trial. Five jurors admitted that they had read the article. Under the circumstances, the court concluded that the jurors who had read the article were unable to be impartial.
In People v. Hryciuk, 5 Ill.2d 176, 125 N.E.2d 61 (1954), the defendant was convicted of rape. On the last day of trial, local newspapers printed articles about the defendant's trial, stating that the defendant had confessed to two murders. One paper also reported that the defendant had boasted of attacking more than fifty women, and that the police described the defendant as a "vicious degenerate." All of the jurors had read at least one of the articles. The defendant moved for a mistrial, which the trial court denied. The Illinois Supreme Court reversed the defendant's conviction. The court opined that the nature of the articles would incite the jury and that "such emotions would linger in the consciousness of the most honest juror and tempt him [or her] to disregard the fundamental requirement of a fair trial and resolve *1058 any doubts he [or she] might have against the defendant." Id. at 66.
2. Reversal Not Warranted
In other cases, courts have found no error in the denial of a mistrial based on jurors having read, during trial, newspaper articles regarding a defendant's prior record.
In People v. Malmenato, 14 Ill.2d 52, 150 N.E.2d 806, cert. denied, 358 U.S. 899, 79 S.Ct. 222, 3 L.Ed.2d 148 (Ill.1958), for example, the defendant was convicted of attempted burglary. During the trial, a newspaper article recounted that the defendant "reportedly has a record of 43 arrests and no convictions." Id. at 812. Inquiry by the court elicited that one juror had violated the trial court's instructions not to read articles about the trial. The trial court admonished the juror that what he had read was not evidence and should not influence him in his deliberations and that he should not discuss it with the other jurors. The trial court also inquired as to whether he thought he could still be an impartial juror. The juror responded that the article "didn't have that much effect on me." Id. Under those circumstances, the trial court denied the defendant's motion for a mistrial.
Upholding that decision, the Illinois Supreme Court stated that, "[t]o warrant a reversal, it must reasonably appear that the jurors, or at least some of them, have been influenced or prejudiced to the extent that they cannot be fair and impartial." Id. at 813. The court found evidence of such influence or prejudice to be lacking in that case.
In United States v. Bass, 10 F.3d 256 (5th Cir.1993), the defendant was tried in federal court on charges of interstate transportation of a stolen vehicle and interstate transportation of stolen firearms. On the second day of trial, two jurors read a newspaper article reporting that the defendant had been charged with capital murder of the owner of the vehicle he had allegedly stolen. One juror stated that the article would not affect her ability to make a decision based solely on the evidence presented at trial. The other juror was more equivocal about her ability to do so. She was not dismissed, but was named an alternate and did not participate in the deliberations. The United States District Court refused to grant a mistrial based on the jurors having read the article, and the Court of Appeals affirmed. Significantly, the decision of the Court of Appeals to affirm was based on the fact that the article reported only other charges and, hence, it was less prejudicial than articles which reported prior convictions.
In People v. Jones, 65 Ill.App.3d 435, 22 Ill.Dec. 377, 382 N.E.2d 697 (1978), the Appellate Court of Illinois affirmed the defendant's conviction in a case in which jurors had read an article reporting that appellant had been convicted of one crime and charged with another similar to that for which he was being tried. In Jones, the defendant was convicted of burglary and the robbery and rape of an eighty-seven-year-old woman. The second day of trial, a local newspaper printed an article about the trial. The headline read, "JONES BEING TRIED ON SECOND RAPE CHARGE." Id., 22 Ill.Dec. 377, 382 N.E.2d at 699. The article stated that the defendant was already sentenced for raping another eighty-seven-year-old woman, and that charges were pending on a third charge of raping a sixty-five-year-old woman.
Eight of the jurors had not seen the article. One had seen only the name "Jones." A second had seen the headline. A third had seen the headline and first paragraph and a fourth had read the article. The appellate court acknowledged that the information in the article was prejudicial and not appropriate for the jury's consideration.
The court noted that, although the nature of the article was the most important consideration, there were others. It noted that the information concerned only other offenses rather than evidence suppressed *1059 in the case on trial. The court also noted that the information had not been given to the newspaper by the prosecutor. The court held that, under the circumstances, the trial court's denial of the motion for a mistrial was not an abuse of discretion.
People v. Bassett, 84 Ill.App.3d 133, 39 Ill.Dec. 534, 404 N.E.2d 1125 (1980), is also illustrative of the court's reliance on the dissimilar nature of the prior offense. There, the Illinois Appellate Court affirmed the trial court's denial of a mistrial requested after two jurors read a newspaper article which reported that the defendant had previously been convicted of aggravated battery. The court noted that, as in Jones, the prejudicial information related to other offenses and did not concern evidence suppressed in the case on trial.
B. Effect of Jurors' Assurances of Impartiality
1. Trial Court Entitled To Rely On Jurors' Assurances
In many of the cases in which jurors' knowledge of extraneous prejudicial information was held not to require reversal of a defendant's conviction, the appellate court's decision was based on its conclusion that the trial court was entitled to rely on jurors' assurances that they would be able to reach a verdict based only on the evidence at trial.
For example, in State v. Hunter, 551 So.2d 1381 (La.Ct.App.1989), the trial court refused to grant a mistrial after five jurors saw an article stating that the defendant was a convicted felon and that he had escaped from prison prior to his trial. The trial court and counsel had questioned each juror who had seen the article, and told the jurors that the contents of the article, as well as the discussions with the court and counsel, were not to be discussed among themselves or during deliberations. The Louisiana Court of Appeal affirmed the trial court's denial of the mistrial, noting that each juror stated that he or she was "not so impressed by the article as to be incapable of rendering a fair and impartial verdict." Id. at 1385. The appellate court also noted that it had reviewed the article and did not find it to be "too prejudicial to be overcome by a mere admonition by the trial judge." Id.
In Harrison v. State, 651 So.2d 1134 (Ala.Crim.App.1994), one juror had read an article about the defendant's case. Although it is not clear how many jurors had read the article, only one juror stated that he thought the article would affect his decision. On subsequent questioning, however, the juror stated that the portion that bothered him was the fact that the defendant had fled the state. The trial court noted that there was already evidence of that fact in the record. The trial court denied the defendant's motion for a mistrial. Affirming that decision, the appellate court noted that the juror was "extensively questioned" and "that he stated many times that he could try the case impartially based on the evidence presented from the witness stand." Id. at 1137.
In People v. Malmenato, 14 Ill.2d 52, 150 N.E.2d 806, the Illinois Supreme Court affirmed the trial court's denial of a mistrial requested after it became known that one of the jurors had read an article stating that the defendant had a record of forty-three arrests and no convictions. The trial court admonished the juror that nothing in the article was evidence against the defendant and that the article should not be discussed with other jurors or influence him in his deliberations. The Illinois Supreme Court noted that there was nothing in the present case to indicate that the jurors discussed the article, that the juror who read the article stated that it would not prevent him from being impartial, and that the juror was "solemnly admonished" by the trial court not to mention the article to the other jurors. Malmenato, 150 N.E.2d at 813. The Illinois Supreme Court also noted that all jurors were reminded that nothing in a newspaper could be considered evidence in the case. The court concluded that, under the circumstances, *1060 there was no evidence that any of the jurors had been influenced or prejudiced to the extent that they could not be fair and impartial.
In State v. Harris, 315 N.C. 556, 340 S.E.2d 383 (1986), the North Carolina Supreme Court considered the effect of jurors having read a newspaper article that discussed the case on which they sat. The article stated, among other things, that the defendant had confessed to driving a car to the scene of the offense, that he admitted taking his confession from a police officer's desk and throwing it away, and that the prosecutor had said that the case might be dropped if the confession were held to be inadmissible. The court stated that it did not find the article prejudicial, because most of the matters discussed in the article had been presented as evidence at trial. The court further stated that, even if the article were prejudicial, the trial judge's instruction not to consider the contents of the newspaper article "cured any possible prejudice." Id. at 390. The North Carolina Supreme Court also noted that the jurors had affirmatively indicated that they could put the article out of their minds and remain impartial and limit their deliberations to matters adduced at trial.
In Pacheco v. State, 82 Nev. 172, 414 P.2d 100 (1966), the Nevada Supreme Court affirmed the conviction of the defendant of kidnapping for the purpose of committing rape or infamous crime against nature, despite the fact that six of the jurors had read a newspaper article which had referred to the fact that the defendant had previously been convicted of robbery and that his co-defendant had pled guilty to kidnapping and committing an infamous crime against nature. When questioned, the jurors had stated that they could still give the defendant a fair trial. In addition, one juror had read an article on the second day of trial mentioning the defendant's prior robbery conviction and an article the next day which was entitled "Companion Slips Companion Whiskey During Court Trial." Another juror had read the headline of the whiskey story and a third juror said he had been told about it. All three jurors, upon being questioned in open court, stated that they had not been biased by the articles and could give the defendant a fair trial.
The Nevada Supreme Court noted that the articles were factual and objective "and not expressly intended to arouse community emotions." Id. at 102 (citation omitted). The court took cognizance of the fact that the information about the co-defendant's guilty plea was not sufficiently prejudicial to require a new trial. The court further commented that the jurors had been repeatedly admonished not to form an opinion until the case was submitted to them.
In determining that the defendant's right to a fair trial had not been violated by the jurors reading the articles, the court noted that the jurors had not been exposed repeatedly and in depth to the news accounts. The court stated that, while it is advisable for the trial court to caution the jury not to read or listen to news accounts, under the circumstances of that case, it believed the jurors "gave heed to the instruction of the court not to form an opinion until the case was finally submitted to them."
In People v. Bassett, 84 Ill.App.3d 133, 39 Ill.Dec. 534, 404 N.E.2d 1125, the defendant had been convicted of reckless homicide. On the second day of trial, an article was published in the local newspaper which stated that appellant had previously been convicted of aggravated battery. Two of the jurors read the article. One of the jurors stated that he could not be impartial and was dismissed. The other juror stated that he would be able to be fair and impartial. The trial court warned the juror not to discuss the article with the other jurors. The trial court denied the defendant's motion for a mistrial and the defendant appealed that denial.
The Illinois Appellate Court affirmed the decision of the trial court. The appellate court found that the dialogue with the *1061 juror "clearly indicate[d] his ability to be fair and impartial." Bassett, 39 Ill.Dec. 534, 404 N.E.2d at 1127. The appellate court also noted that the trial court had admonished the juror not to discuss the article with the other jurors. It concluded that the prejudicial information concerned only other offenses and did not contain any references to evidence suppressed in the case on trial, and that there was no indication that the prosecutor had any connection with the article. The appellate court also opined that the article was not inflammatory in nature.
2. Jurors' Assurances Insufficient a. Unavailability ofvoir dire procedure
In some cases, the circumstances of the jurors learning of the prejudicial material rendered the court unable to conduct an appropriate voir dire. Under those circumstances, the courts have reversed convictions because of the jurors' knowledge of extraneous prejudicial information.
In Basiliko v. State, 212 Md. 248, 129 A.2d 375 (1957), the Court of Appeals reversed Basiliko's conviction for conspiracy to defraud the State and the members of the State Roads Commission by using improper information to buy real property along the route of a proposed road. During the trial, a circuit court judge who had sold Basiliko a portion of the land brought a civil suit that, in effect, repeated the allegations of the criminal trial. The civil suit received wide media coverage. Basiliko moved for a mistrial, alleging that members of the jury received newspapers and had radios and televisions, and stating his belief that the jurors had heard reports of the civil action. The trial court denied the mistrial. The Court of Appeals reversed Basiliko's conviction. The Court stated that
the civil suit, both as filed and as truthfully reported, could have left no doubt in anyone's mind that the well known, highly respected, competent and experienced judicial officer who was one of the plaintiffs in the civil suit believed [appellant] guilty of conduct of the very kind with which he was charged in the criminal case. It amounted almost to a finding by him on the very questions on which the jury would have to pass in determining whether [appellant] was guilty.
Id. at 264, 129 A.2d 375. The Court observed that, while it had not been shown that any individual juror had actually read or heard of any of the articles or broadcasts, it would have been impossible to question the jurors about the matter "without bringing it home to them in a most forceful way and in a way most damaging to [appellant]." Id. at 263, 129 A.2d 375.
The importance of the voir dire was also recognized in Hughes v. State, 490 A.2d 1034 (Del.1985), where some of the jurors learned prior to trial that the defendant had previously been convicted of the offense for which he was being tried. In addition, at least one juror had learned that the defendant had taken a polygraph test. These matters were discussed by the jury during its deliberations. The Delaware Supreme Court held that under the circumstances the jurors' knowledge infringed on the defendant's right to a fair trial. In its decision, the court pointed to the inadequacy of the voir dire as a crucial factor underlying its decision. The court stated:
The purpose of voir dire examination is to provide the court with sufficient information to decide whether prospective jurors can render an impartial verdict based on the evidence developed at trial and in accordance with the applicable law.... Because demeanor plays a crucial role in the determination of impartiality, the trial judge is in a unique position to evaluate jurors' assurances of impartiality.... The brief voir dire inquiry conducted here, directed generally at a group of 112 persons, did not allow *1062 an opportunity to observe the demeanor of any one juror.
Id. at 1041-42 (citations omitted).
In People v. Holloway, 50 Cal.3d 1098, 269 Cal.Rptr. 530, 790 P.2d 1327, the California Supreme Court also noted the effect of the trial court's lack of opportunity to remedy the juror's misconduct. Reversing the defendant's conviction, the court stated:
Our conclusion might have been different had the misconduct been revealed in time for the court to have taken corrective steps to cure it through admonition or by other prophylactic measures.
Id., 269 Cal.Rptr. 530, 790 P.2d at 1334.
It should be noted that the Holloway court concluded that the presumption of prejudice "may be rebutted by proof that no prejudice actually resulted." Id., 269 Cal.Rptr. 530, 790 P.2d at 1332 (citations omitted). Whether the presumption of prejudice has been rebutted, in our judgment, must be decided on a case-by-case basis, balancing the likely prejudice, i.e., similarity of prior offenses and the strength of the State's case against any curative measures undertaken by the presiding judge.

b. Jurors' assurances of impartiality ineffective
In other cases, courts have concluded that, despite jurors' assurances that they can be fair and impartial, the information contained in a news report was sufficiently prejudicial to warrant reversal of the defendant's convictions.
In United States v. Williams, 568 F.2d 464, the defendant was being retried for the crime of depriving a man of his civil rights. He had previously been convicted of the crime, but that conviction had been reversed on appeal. On the second day of the retrial, a television news report was broadcast indicating that appellant had previously been convicted of the charge, but that the conviction had been reversed because of "erroneous testimony." Five of the jurors admitted knowing of the report, but only two jurors had seen it. Both stated that the news story would in no way influence their decision in the case. The trial court subsequently instructed the jury to disregard everything not heard in court. The Fifth Circuit concluded that the jurors' learning of the prior trial and its result was perhaps even more damaging than information about a defendant's prior criminal acts. Particularly pertinent to the case sub judice, the court noted that the assurances by the jurors that they could decide the case solely on the evidence adduced in court was not controlling. The Williams court stated:
The effect of exposure to extrajudicial reports on a juror's deliberations may be substantial even though it is not perceived by the juror himself [or herself], and a juror's good faith cannot counter this effect. For that reason, we have recognized that such assurances from jurors may not be adequate to eliminate the harm done by a news report.
Williams, 568 F.2d at 471 (footnotes omitted; citation omitted).
Similarly, in People v. Hryciuk, 5 Ill.2d 176, 125 N.E.2d 61, the Illinois Supreme Court affirmed a post-conviction determination that the trial court had abused its discretion by failing to grant the defendant's motion for a mistrial. The court opined that the statements of jurors that reading a prejudicial newspaper article had not influenced them should not be considered conclusive. Hryciuk, 125 N.E.2d at 65. It stated that the determination of whether the extraneous information interfered with the defendant's right to a fair trial must rest in the sound discretion of the court. Id. at 65-66.
In People v. Keegan, 52 Ill.2d 147, 286 N.E.2d 345, cert. denied, 406 U.S. 964, 92 S.Ct. 2408, 32 L.Ed.2d 663 (Ill.1972), two jurors had read a newspaper article about the case during jury selection. The article stated that the police had found color slides of nude and partially unclothed children in the defendant's home and that the slides had been suppressed on motion of *1063 the defendant's attorney. The article also stated that the defendant was also named in four similar complaints. The Illinois Supreme Court reversed the defendant's conviction despite the statements of the two jurors that the article had not influenced them.
In State v. Roman, 473 So.2d 897, the Louisiana Court of Appeal reversed the defendant's forcible rape and aggravated crime against nature convictions because five jurors had read a newspaper article that indicated that the defendant had prior convictions for rape and robbery and that he had been arrested for rape and robbery three times in the previous year. The trial court had admonished the jurors to disregard the article. The Court of Appeal opined that the references to the previous convictions were "too prejudicial to be overcome by a mere admonishment" and that "there was a substantial possibility that the jurors who had this knowledge were unable to be impartial." Roman, 473 So.2d at 900.
In Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, the United States Supreme Court held that the prejudice to the defendant arising from seven jurors having read news accounts of his prior convictions was not overcome by the jurors' statements that they could decide the case only on the evidence presented in court. In fact, in People v. Holloway, 50 Cal.3d 1098, 269 Cal.Rptr. 530, 790 P.2d 1327, the Supreme Court of California stated that "the testimony of the jurors is [not admissible] ... to show whether it did or did not influence their deliberations and decision." Id. at 1332.
C. Other Evidence
In addition, in determining whether a defendant had been prejudiced by the information, the trial court may consider whether the evidence was so overwhelming that the jury could not have reasonably reached any verdict other than a conviction. See, e.g., Arndt v. State, 93 Nev. 671, 572 P.2d 538 (1977); Oseman v. State, 32 Wis.2d 523, 145 N.W.2d 766 (1966).
In United States v. Bass, 10 F.3d at 260, the Court of Appeals, in affirming the defendant's convictions, noted that "the information conveyed by the article could not have been more prejudicial on the counts for which he was standing trial than [defendant's] confession of theft." See also People v. Keegan, supra, wherein the Illinois Supreme Court reversed the defendant's conviction after jurors had read an article informing them of evidence that the trial court had suppressed other charges pending against the defendant. The appellate court, in stating that it was "not prepared to speculate what the verdict might have been if two jurors had not read the prejudicial article," noted that 16 "prominent citizens" testified that the defendant's "general reputation in the community for moral character, moral conduct and truthfulness was excellent." Keegan, 286 N.E.2d at 349.
In People v. Holloway, 50 Cal.3d 1098, 269 Cal.Rptr. 530, 790 P.2d 1327, however, the California Supreme Court stated the standard to be used in determining whether the presumption of prejudice has been rebutted was that the conviction must be reversed or vacated whenever the court "`finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.'" Id., 269 Cal. Rptr. 530, 790 P.2d at 1333 (quoting 2 ABA Standards for Criminal Justice, std. 8-3.7). The court noted that that analysis was "different from and indeed less tolerant than the `harmless-error analysis' for ordinary error at trial." Id.
D. Number of Jurors
To some extent, the number of jurors who have read the prejudicial information may be relevant. In Allen v. State, 89 Md.App. 25, 597 A.2d 489 (1991), cert. denied, 325 Md. 396, 601 A.2d 129 (1992), we *1064 noted that, "[w]here potentially prejudicial extrinsic evidence has reached an entire jury, courts have proven far more likely to grant a motion for mistrial or new trial." Id. at 48, n. 10, 597 A.2d 489 (citations omitted).
In United States v. Bass, 10 F.3d 256, the Court of Appeals affirmed the defendant's convictions, distinguishing United States v. Williams, 568 F.2d 464, and Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, on the grounds that, in those cases, a greater number of jurors had been affected.
E. Misconduct on the Part of Jurors
Another factor that has been considered is whether the extraneous information reached the jurors because someone had failed to heed the trial court's admonition not to read news accounts of the trial, rendering the reliability of that juror suspect. As the Supreme Court of Pennsylvania explained in Commonwealth v. Williams, 494 Pa. 496, 431 A.2d 964, 965 (1981) (citations omitted):
The jur[or] who read the newspaper article was sufficiently impressed by the account to discuss it with a fellow juror who had not seen it. Having thus so flagrantly disregarded the trial court's instructions not to read accounts of the trial or to discuss the trial with anyone, even other jurors, until the case was committed to them, we cannot agree with the majority of the Superior Court that these two jurors could, would, and did adhere to the court's admonition to disregard the newspaper account that additional evidence [of] guilt was available but not being offered, and, most importantly, that the petitioner had been convicted previously of this same offense which conviction was reversed because of a "technicality". [sic]
A similar view was expressed in People v. Rogers, 135 Ill.App.3d 608, 90 Ill.Dec. 660, 482 N.E.2d 639, 653 (1985), wherein the Appellate Court of Illinois stated:
Another consideration is the fact that none of the jurors informed the court of [the juror's] action until after the verdict was rendered. This may be indicative of a lack of appreciation for their responsibility as jurors.
(Citations omitted.)
However, the fact that the jurors were not disobedient in learning the prejudicial information is not determinative. See, e.g., State v. Roman, supra, (where the defendant's conviction was reversed despite the fact that the trial court had not instructed the jury not to read any news account of the trial).

APPLICATION TO THE PRESENT CASE
The present case is a difficult one because of the similarity of appellant's prior offenses and those for which he was being tried, and because of the inflammatory nature of the evidence and the emotional nature of the crimes. According to the article printed in Ocean City Today, appellant had previously been convicted of an "indecent liberties" charge, a fourth degree sex offense charge, and a perverted practice charge. In addition, the article alleged that he had been charged with, but not convicted of, rape and a sex offense by suffocation. Further, the information was read by all of the jurors.
The evidence against appellant was strong, but not overwhelming. He was the last person seen with Ruggles on the day most likely to have been the day of her death. Her body was found in an area between Ocean City and appellant's home, in a remote area not likely to be known to someone unfamiliar with the area. In addition, there was evidence that appellant gave Corporal McQueeney a false explanation of what had occurred and that he had made inconsistent statements to Corporal McQueeney and Dolch. The jury was also entitled to believe or disbelieve the testimony of Lewis, that appellant had confessed to killing Ruggles. Absent the confession, *1065 the evidence was circumstantial and the jury could have found appellant not guilty.
On the other hand, the trial court inquired of the jurors after they had read the article. Each juror indicated that he or she could decide appellant's guilt or innocence solely on the basis of the evidence presented at trial. The trial court was able to observe the demeanor of the jurors and believed their assurances. In addition, he instructed the jurors that they were not to discuss the information in the articles during their deliberations. It is also clear that the jurors took seriously their responsibility to decide the case based on appropriate evidence, as indicated by the fact that they notified the trial court when they questioned the admissibility of the newspaper articles.
In our view, however, the dispositive factor in this case is the similarity of the offenses alleged against appellant in the prior cases to those for which he was on trial. As Williams, supra, Hryciuk, supra, and Keegan, supra, point out, exposure to extrajudicial reports on a juror's deliberations may be substantial even though it is not perceived by the juror himself or herself. Although the jurors may have honestly thought that they could disregard the information in the articles, in our judgment, any doubts the jurors may have had, reasonable or otherwise, would have been resolved against appellanteven if only subconsciouslyas a result of the information contained in the articles.
JUDGMENTS OF THE CIRCUIT COURT FOR WORCESTER COUNTY REVERSED.
COSTS TO BE PAID BY WORCESTER COUNTY.
NOTES
[1] Tera Charles, a State's witness, was unable to attend the trial. Her testimony, as stipulated to by the parties, was read into the record by a secretary in the State's Attorney's Office.
[2] Apparently appellant waited while Ruggles was speaking to Brian, although it is not entirely clear.