# Illinois Official Reports

## Appellate Court

---

### *People v. Walker*, 2020 IL App (4th) 180774

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALFRED ROLAND WALKER, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-18-0774 |
| Filed | October 22, 2020 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 17-CF-645; the Hon. Robert L. Freitag, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Catherine K. Hart, and Janieen R. Tarrance, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Lara L. Quivey, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CAVANAGH delivered the judgment of the court, with opinion.<br>Justices Knecht and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1    In a bench trial in the McLean County circuit court, defendant, Alfred Roland Walker, was convicted of home invasion (720 ILCS 5/19-6(a)(3) (West 2016)), armed robbery (*id.* § 18-2(a)(2)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)). He appeals, challenging the sufficiency of the evidence. Viewing all the evidence in the light most favorable to the prosecution and resolving all reasonable inferences in the prosecution's favor, we conclude that a rational trier of fact could find the elements of those offenses to be proven beyond a reasonable doubt. Therefore, we affirm the judgment.

¶ 2                                    I. BACKGROUND
¶ 3                    A. The Home Invasion and the Shooting of Kevin Powell
¶ 4    Darla Powell lived at 1528 Julie Drive in Bloomington, Illinois, with her husband, Kevin Powell. Around 6:30 p.m. or 6:45 p.m. on November 9, 2016, she was home alone when the doorbell rang. She was not expecting any visitors. She turned on the porch light and asked who it was. "[P]izza delivery,' " a man outside answered. Intending to tell the supposed deliveryman that he was at the wrong address, she opened the door.

¶ 5    Three men were standing inside the screen door. One of the men, who was holding a pizza box from Casey's General Store (Casey's), pointed a pistol in Darla Powell's face. He asked her where her husband was. She answered that he was not home. The three men barged into the house. The man with the pistol told Darla Powell, " '[S]it down here, [b]itch.' " She sat down on a swivel chair by the door. Using a roll of duct tape they had brought with them, the intruders taped her ankles together and taped her mouth shut. They also intended, apparently, to tape her hands together behind her back, but, instead, they ineptly taped her left hand into a fist, leaving her right hand free.

¶ 6    In her testimony, Darla Powell described all three men as African-American. Two of them were of a darker complexion, and the third was of a lighter complexion. One of the men was taller than the other two. The first man was of a darker complexion and had a goatee. He was wearing a black top, black pants, and no mask. The second man had a lighter complexion and was wearing black pants and maybe a track jacket. He had no mask on, either. These first two men were not much taller than Darla Powell, who was five feet, four inches. The third man was taller than she. He wore camouflage pants, a white shirt, and a ski mask that covered the bottom half of his face.

¶ 7    While one of the three men stood watch over Darla Powell, the other two rifled through the contents of the house, asking her over and over again where the money was. As they were tearing through the house, there was a bump in the basement. The furnace always bumped against the wall when it turned on. One of the men ran up the hallway and said, " 'Mack, somebody is in the basement.' " Darla Powell assured them that no one was in the basement.

¶ 8    After searching the house, overturning things, one of the men cautioned to the other two that they had been there for about 20 minutes and that they had best be on their way. The intruders then loosened the tape from Darla Powell's mouth and, holding her cell phone to her face, commanded her to persuade her husband to return home by telling him that a lamp had fallen and broken. Kevin Powell did not answer his phone. Then Darla Powell's mother called.

While one of the men stood next to Darla Powell with a pillow and a pistol, she told her mother she would call back. Soon Kevin Powell called. Foreseeing that a broken lamp would be insufficient to induce him to come home, Darla Powell told him, instead, that their big-screen television was falling off the wall.

¶ 9 As Kevin Powell was on his way home, the three men carried Darla Powell to the garage and shut her in the trunk of the car. While in the trunk, she heard three gunshots. Then she heard Kevin Powell calling out to her, asking her if she was all right. She pulled the emergency release latch inside the trunk and got out. Kevin Powell, his face bloody, was elbowing himself forward along the kitchen counter.

¶ 10 Believing that the intruders had taken her cell phone with them (it later was found on a footstool in the house), Darla Powell ran across the street and asked the neighbors to call 911. The 911 call was made at 7:39 p.m. on November 9, 2016.

¶ 11 Kevin Powell testified that he was in the car-detailing business and that he owned two shops, side by side, right around the corner from where he and his wife lived. He had a conviction, from 2010, for dealing cocaine, but he had reformed himself (although he still smoked marijuana), and now his passion was cleaning cars. (When responding to the incident, the police noticed a smell of fresh and burnt marijuana in the house, but they saw only a minimal amount of marijuana, consistent with personal use.) Commonly, Kevin Powell worked at his car-detailing trade seven days a week. On November 9, 2016, he went to work, as usual. Around 7 p.m., just as he was leaving a chicken restaurant, he received a call from his wife urging him to come home because the television was falling off the living room wall.

¶ 12 He came home, and as he was walking up the driveway, he was approached by three masked men armed with pistols. They rushed him into the house. The apparent ringleader demanded from Kevin Powell a specific sum, $40,000, pistol-whipping him and telling him, " 'We know you got it. You got them shops right around the corner.' " But Kevin Powell did not have $40,000 in the house. Not even in his drug dealing days did he have that kind of money lying around.

¶ 13 The ringleader tried, futilely, to beat the information out of Kevin Powell, who was unable to give up what he did not have. Getting hit in the face and head with the butt of a pistol caused him to fall onto the living room couch. One of the men then duct-taped his ankles together. Kevin Powell had his work hoodie on, and the man who had pistol-whipped him picked up a pillow and commanded him to cover his head with his hood. Perceiving that the plan was to shoot him in the head, Kevin Powell refused to cooperate with his own execution. He stood up from the couch, saying, " 'If [y]ou're going to shoot me, you're going to have to shoot me to my face.' " One of the three men commented that he was tough, and they opened fire on him— three shots, one after another—shooting him in the leg and the arm. Kevin Powell fell to the living room floor. The three men then ran out of the house, taking his cell phone with them.

¶ 14 On June 13, 2017, Kevin Powell went to the Bloomington Police Department for an interview. He was shown a photographic array. He circled one of the photographs simply because he recognized the person in that photograph. It was a man whom he knew as " 'Big Mack' " or " 'Fat Mack.' " He knew this man as a friend of his brother-in-law. About three months before the incident, he saw Fat Mack in a Kreg Therapeutics truck, next door to the shops. He flung up his arm, and Fat Mack flung up his arm. Big Mack or Fat Mack was defendant, and Kevin Powell identified him as such in court. Kevin Powell did not know, in the police station, that the purpose of the photographic array was to identify the perpetrators.

He just thought the purpose was to identify people whom he recognized. Initially, it did not occur to Kevin Powell that defendant was one of the men who had invaded his home. All three of the intruders had been wearing masks. But after watching a surveillance video from Casey's, which showed defendant buying a pizza from Casey's and wearing the same black clothing that one of the intruders had worn, Kevin Powell was convinced that defendant was, in fact, one of the masked intruders—because the clothing matched. But, the night of the incident, Kevin Powell did not think, " '[Defendant is] in my home.' "

¶ 15                     B. Fingerprints on the Casey's Pizza Box

¶ 16       The Casey's pizza box was left behind on the living room couch of the Powell residence. The fingerprints of both defendant and Jamal Parks were found on the pizza box.

¶ 17                     C. Defendant's Account to the Police

¶ 18       Upon being informed that his fingerprint was found on the Casey's pizza box and upon being shown the surveillance video of him buying pizza from Casey's at 5:35 p.m. on November 9, 2016, defendant admitted to the police, right away, that it was he who was pictured in the surveillance video. He then gave the police the following account. Within five minutes after defendant bought the pizza at Casey's, two men, one of whom defendant knew as "June," bludgeoned him with a pistol and robbed him of the marijuana he had on his person. They then forced him into a car and dropped him off near the intersection of Main Street and Lincoln Street, near a Freedom gas station. When defendant was let out of the car, he ran. Afterward, defendant spoke with June by phone, threatening to exact revenge for the taking of his marijuana.

¶ 19                 D. What Is Known About Parks, Other Than That He,
                     Along With Defendant, Handled the Pizza Box

¶ 20       A Bloomington detective, John Atteberry, testified he had been informed by police in the Chicago area that Jamal Parks was a member of a rip-off crew, the *modus operandi* of which was arranging to buy drugs as a ruse to rob the drug dealer. In January 2017, Parks died in an encounter with the police. (Defense counsel said in his cross-examination of Kevin Powell: "Jamal Parks is the man that [Detective Atteberry] describes as having come from Chicago who was killed up north by police." Kevin Powell answered: "Okay. I was told that he was killed.")

¶ 21       In the interview in the police station, defendant denied knowing Parks. He denied that "June" was Parks.

¶ 22                                 E. Cell Phone Records

¶ 23                 1. *Communications Between Defendant's Phone and*
                     *Parks's Phone on November 8 and 9, 2016*

¶ 24       Detective Atteberry testified to the call records in People's exhibit No. 26, an exhibit that was admitted without objection. The telephonic communications between defendant's phone number and Parks's phone number are highlighted in this exhibit.

¶ 25       The following communications occurred between defendant's phone and Parks's phone on November 8, 2016: (1) a voice call from Parks to defendant at 8:36 a.m. that lasted 259

seconds, (2) a voice call from Parks to defendant at 3:10 p.m. that lasted 144 seconds, and (3) a voice call from defendant to Parks at 8:25 p.m. that lasted 503 seconds.

¶ 26 The following communications occurred between defendant's phone and Parks's phone on the day of the incident, November 9, 2016: (1) a voice call from Parks to defendant at 12:02 p.m. that lasted 53 seconds, (2) a text message from defendant to Parks at 12:05 p.m. and one second, (3) a text message from Parks to defendant at 12:05 p.m. and 37 seconds, (4) a voice call from defendant to Parks at 1:08 p.m. and 11 seconds that lasted 31 seconds, (5) a voice call from Parks to defendant at 1:08 p.m. and 50 seconds that lasted 41 seconds, (6) a voice call from Parks to defendant at 1:13 p.m. that lasted 25 seconds, (7) a voice call from Parks to defendant at 1:14 p.m. that lasted 24 seconds, (8) a voice call from defendant to Parks at 1:17 p.m. that lasted 38 seconds, (9) a voice call from defendant to Parks at 3:04 p.m. that lasted 27 seconds, (10) a voice call from Parks to defendant at 3:14 p.m. that lasted 27 seconds, (11) a voice call from defendant to Parks at 3:15 p.m. and 24 seconds that lasted 8 seconds, (12) a voice call from Parks to defendant at 3:15 p.m. and 37 seconds that lasted 55 seconds, (13) a voice call from Parks to defendant at 6:57 p.m. that lasted 6 seconds, (14) a voice call from defendant to Parks at 7:57 p.m. that lasted 38 seconds, (15) a voice call from defendant to Parks at 8:16 p.m. that lasted 30 seconds, and (16) a voice call from defendant to Parks at 9:29 p.m. that lasted 8 seconds.

¶ 27 In a nutshell, defendant and Parks had three telephone conversations on November 8, 2016. They called or texted one another 12 times on November 9, 2016, before the incident, during the period of 12:02 p.m. to 3:15 p.m. Then they spoke on the phone three further times on November 9, 2016, after the incident, beginning at 7:57 p.m. (18 minutes after the 911 call).

¶ 28 2. *A Historical Cell Site Analysis*

¶ 29 Greg Catey testified that he was a special agent with the FBI. He was a member of the FBI's cellular analysis survey team, which specialized in determining where cellular phones were located on specific dates and at specific times.

¶ 30 Using records from Sprint, Catey was able to determine the general area of Bloomington where defendant's cell phone was located when the phone was used from 7:19 p.m. to 7:38 p.m. on November 9, 2016. There was a cell tower, tower 2505, near Lincoln Street and Bunn Street in Bloomington, less than 1000 feet from the Powell residence. An outbound call was made from defendant's phone at 7:19 p.m. on November 9, 2016, and another outbound call from his phone was made a minute later. We know the numbers that were called from defendant's phone but not to whom those numbers belonged. Those outbound calls of 7:19 p.m. and 7:20 p.m. on November 9, 2016, used sector 2 of tower 2505. Then, at 7:26 p.m., 7:37 p.m., and 7:38 p.m. on November 9, 2016, there were three incoming calls to defendant's phone, and those incoming calls used sector 3 of tower 2505. We know the numbers that called defendant's phone these three times but not to whom those numbers belonged. (As far as we know, the previous call that defendant had made to Parks was at 6:57 p.m. on November 9, 2016, and the next call from defendant to Parks would be at 7:57 p.m. on November 9, 2016. The record does not appear to reveal with whom defendant was in telephonic contact in those interim five calls from 7:19 p.m. to 7:38 p.m.)

¶ 31 Tower 2505, Catey explained, was a three-sided tower, with antennas or panels on each of the three sides. The reason why cell towers were made that way was to maximize their capacity for carrying phone traffic. The three sides of tower 2505 "sectorized" the service area for that

tower into three parts, like dividing a pie into three slices. Sector 1 sent out energy to the northeast (roughly speaking), sector 2 to the southeast, and sector 3 to the northwest. When a cell phone was powered on, it searched for the strongest and cleanest signal. If a cell phone was within the service area of tower 2505, the cell phone would decide which sector of that tower was transmitting the cleanest signal at the cell phone's location—sector one, sector two, or sector three—and the cell phone would lock onto that signal.

¶ 32    The records from Sprint for defendant's phone showed that when defendant's phone made the calls at 7:19 p.m. and 7:20 p.m. on November 9, 2016, it used sector 2 of tower 2505. When defendant's phone received the calls at 7:26 p.m., 7:37 p.m., and 7:38 p.m. on November 9, 2016, it used sector 3.

¶ 33    The question that needed answered, then, was what were the "actual" radio "footprints" of sectors 2 and 3? In other words, what was the area of Bloomington where a cell phone would lock onto sector 2? And what was the area of Bloomington where a cell phone would lock onto sector 3? Catey determined the answers to those questions by driving up and down the streets around tower 2505 with a device that mimicked a cell phone.

¶ 34    In People's exhibit No. 24, Catey colored onto a map of Bloomington the coverage of sector 2 and the coverage of sector 3. Tower 2505, in this map, is a black dot, and sector 2 is an irregularly shaped aqua-colored puddle extending roughly 3000 feet to the northwest of the tower. (The map includes a distance ruler). Sector 3 is an irregularly shaped purple puddle extending roughly 6000 feet to the southeast of the tower. The two puddles overlap at the bottom of sector 2 and the top of sector 3. In the overlap, less than 1000 feet southwest from the tower, is the Powell residence, signified by a red icon. The Freedom gas station, signified by a blue icon, sits just outside sector 2, just beyond its western border. Combined, sectors 2 and 3 extend about 11,000 feet from north to south and about 11,000 feet east to west. (These distances are very approximate because, again, the sectors are irregularly shaped. But this should give an adequate idea of the size of the sectors.) By our calculation, then, sectors 2 and 3 cover an area of about four square miles. (Eleven thousand feet is about two miles, and two times two equals four.)

¶ 35    Given that the calls made from defendant's phone at 7:19 p.m. and 7:20 p.m. on November 9, 2016, used sector 2 and that the calls going to defendant's phone at 7:26 p.m., 7:37 p.m., and 7:38 p.m. on November 9, 2016, used sector 3, the prosecutor asked Catey if it were possible to infer that, during the period of 7:19 p.m. to 7:26 p.m., defendant's phone moved from the aqua-colored puddle of sector 3 southward to the purple puddle of sector 2. Catey answered that such an inference would be impossible for him to draw because there was an alternative possibility: during all five phone calls, defendant's phone could have been in the overlap between sectors 2 and 3, such that the phone wavered irresolutely between sectors 2 and 3, choosing one sector in one call and the other sector in another call.

¶ 36    In any event, in Catey's opinion, the records were consistent with defendant's phone's being in the vicinity of 1528 Julie Drive between 7:20 p.m. and 7:38 p.m. on November 9, 2016. But, in his opinion, the records were not consistent with defendant's phone's being at the Freedom gas station between 7:20 p.m. and 7:38 p.m. on November 9, 2016.

¶ 37    On cross-examination, defense counsel asked Catey:

"Q. Your analysis does not say that any location is more likely than not except for within those sectors as indicated in the box, correct?

A. With one exception, sir. The call or the call separation is five minutes.

Q. Sure.

A. So, we have to assume if one call was carried in sector 2 and the other one was carried in sector 3, there's only a five-minute separation. So, where could an individual go within that five-minute period and still be in sector 2 and sector 3 five minutes later? So, like, for example, you were pointing earlier with your laser pointer up to Oakland at the top of sector 3, that would not be probable.

Q. Well, sir, for clarity, you don't know where this phone was in—if it was in a car or if it was on foot. You were not given that information. You are not analyzing that for these purposes, correct?

A. No, sir."

In other words, Catey's point was that there was only a five-minute separation, approximately, between the call in sector 2 at 7:20 p.m. on November 9, 2016, and the call in sector 3 at 7:26 p.m. on November 9, 2016. Therefore, it seemed unlikely to him that, at 7:20 p.m., defendant's phone was as far away as East Oakland Avenue, in the upper northeast region of sector 3. Rather, it seemed more reasonable to suppose that defendant's phone was closer to the overlap between sectors 2 and 3—the overlap, in which the Powell residence was located.

¶ 38                                    F. The Findings of Guilt

¶ 39        The circuit court found defendant not guilty on count I of the indictment, the count charging him with attempted first degree murder (720 ILCS 5/8-4 (West 2016)).

¶ 40        The circuit court found defendant guilty, however, on the remaining five counts of the indictment: specifically, counts II and III, which charged him with home invasion (*id.* § 19-6(a)(3)) (one count pertaining to Darla Powell and the other count pertaining to Kevin Powell); count IV, which charged defendant with armed robbery (*id.* § 18-2(a)(2)); count V, which charged him with aggravated battery with a firearm (*id.* § 12-3.05(e)(1)); and count VI, which charged him with aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)).

¶ 41                         G. The Circuit Court's Rationale for Finding
                              Defendant Guilty on Counts II to VI

¶ 42        After taking the case under advisement and reviewing the evidence, the circuit court gave, orally from the bench, the following rationale for finding defendant guilty beyond a reasonable doubt on counts II to VI.

¶ 43        The circuit court "absolutely believe[d] and [was] convinced that Jamal Parks was present at the Powell[s'] home on November 9th, 2016." Defendant claimed he did not know Parks. And yet, on November 8, 2016, the day before the incident, there were three calls between defendant's phone and Parks's phone, and these were not short calls: the first call was 259 seconds, the second call was 144 seconds, and the third call was 503 seconds. On November 9, 2016, the day of the incident, there were 12 calls between defendant and Parks before the incident at the Powell residence and 4 calls between defendant's phone and Parks's phone after the incident. All of these phone calls led the court (1) to infer that Parks participated in the incident of November 9, 2016, and (2) to "seriously question the defendant's credibility" in his representation to the police that he was unacquainted with Parks.

¶ 44    For four additional reasons, the circuit court found defendant's explanation to the police to be unworthy of belief.

¶ 45    First, defendant represented to the police that on November 9, 2016, a mere five minutes after he bought the pizza at Casey's, "June" and another man pistol-whipped him, robbed him of his marijuana, and abducted him in a car. Supposedly, defendant's captors let him out at Freedom, meaning that they had driven west there from Casey's. When defendant was let out of the car, he ran. But defendant's cell phone records showed that, an hour after he allegedly was robbed of his marijuana, "he either stayed at the Freedom gas station," which was "at the very outside of the service area" (but he denied staying there; he said he ran), or "he ran back to the east, the area where he had just been robbed and beat and hit with the pistol"—"which happen[ed] to put him at or near the location of the Powell[s'] home at the time of this incident occurring." If, instead and more logically, defendant had run or walked north to his home, on Roosevelt Avenue, "he would have been way out of the cell phone service area that he was in at the time the incident at the Powell[s'] home took place." Even if he had walked west toward Market Street to Pop's Grocery Store, where he said he was before he went to Casey's, he likewise "would have been way outside of the cell service area that he was in at the time the incident at the Powell[s'] home took place." It struck the court as unbelievable that defendant would have run "back to where he was just beat[en] up." It made no sense that he would flee to the vicinity of the Powells' home if, as he related to the police, that was the vicinity where he had just been robbed, beaten up, and abducted.

¶ 46    Second, defendant claimed that, after being robbed of his marijuana, "he called the phone registered to Jamal Parks" (whom defendant denied knowing) "to tell him that the next time he [saw] him, it [was] on, meaning that [he was] going to get revenge for [the] taking [of] the marijuana." The trouble was that "the first call after the defendant was allegedly beat[en] up and robbed between Parks'[s] and defendant's phone[s] was an incoming call from Jamal Parks'[s] phone." (Defendant bought the pizza from Casey's at 5:35 p.m. on November 9, 2016, and his first telephonic communication with Parks's phone after that purchase was at 6:57 p.m. on November 9, 2016.) The court was skeptical that "somebody would beat up the defendant, rob him, [and] pistol whip him[ ] and [then] the next call would be an incoming call from the person who beat him up and robbed him."

¶ 47    Third, the timing of the calls from defendant to Parks seemed illogical to the circuit court, given defendant's story to the police. Defendant allegedly was robbed and beaten up at 5:40 p.m. on November 9, 2016. But it was not until 2 hours and 18 minutes later—approximately 30 minutes after the incident at the Powells' home—that defendant called Parks to tell him "it [was] on for robbing him and beating him up." Then, 30 minutes after making his initial call to Parks, defendant made another call to him—and yet another call to him 15 minutes later. "It [was] not credible to the court that the defendant would make three separate calls at these timeframes to Parks'[s] phone to simply tell him next time he sees him, [it was] on for stealing his pot."

¶ 48    Fourth, defendant's demeanor in the video-recorded interview in the police station made the circuit court doubt his credibility. Toward the end of the interview, defendant asked for a cigarette and said, "something to the effect that he [was] going to give the detectives what they [were] looking for." It appeared as if defendant's story was about to change. But then, after he had smoked a cigarette, defendant "change[d] his mind, and the story [went] back to what was initially said to the detectives."

¶ 49    That defendant had told an unbelievable story to the police did not necessarily prove the State's case in the circuit court's view. The State had to "put him at the scene or make him legally accountable for the actions of others." The court found "that the pizza box with the defendant's fingerprints [was] direct physical evidence of defendant's presence and accountability." There also was the surveillance video of him buying pizza from Casey's.

¶ 50    Granted, the Powells had been unable to "make a direct identification of the defendant." According to Kevin Powell, all three men were wearing masks. But after viewing the surveillance video from Casey's, Kevin Powell believed defendant to be one of the intruders because the clothing he saw in the house was the clothing defendant was wearing in the video.

¶ 51    Darla Powell's description of the height and clothing matched that of defendant, even though her description of weight and facial hair did not fit him. Despite those discrepancies, there were "general descriptions that matched the defendant's clothing." Darla Powell, whom the court found to be credible, "stated that *** one of these individuals was dressed in all black, and the video clearly show[ed] that the defendant was dressed in all black at the time the alleged incident took place or the time that he was at the Casey's [G]eneral [S]tore."

¶ 52    Another important piece of evidence, in the circuit court's analysis, was Darla Powell's testimony that " '[t]he lighter skinned gentleman ran up the hallway and said, "Mac, somebody is in the basement." ' " Defendant's street name was Big Mack or Fat Mack.

¶ 53    Also, in a two-day period, November 8 and 9, 2016, there were lots of calls between defendant's phone and Parks's phone. Given Detective Atteberry's description of Parks, he did not "sound like the type of individual who would let somebody use his phone for multiple calls or to buy a phone for somebody else." Instead, the "logical conclusion," in the circuit court's mind, was that "the defendant was talking with Jamal Parks the day before this incident took place and was planning the incident."

¶ 54    Both the call records and the historical cell site analysis weighed heavily against defendant. It was true that "there [could] be differences in where a person [was] located with their cell phone within a cell service area." But the court concluded that "defendant was either in or right outside the Powell[s'] residence at the time this incident took place."

¶ 55    In sum, the circuit court was "convinced beyond a reasonable doubt that the defendant either participated directly or [was] guilty by way of accountability on [c]ounts [II] through [VI] of the bill of indictment." Accordingly, the court found him to be guilty on those counts. The court further found that Kevin Powell—who, at the time of the trial, still could walk only with the assistance of a cane—had "suffered severe bodily injury."

¶ 56                                        H. The Sentences

¶ 57    On count II (home invasion), the circuit court sentenced defendant to imprisonment for 25 years, ordering that this prison term run consecutively to the prison terms imposed on counts IV, V, and VI.

¶ 58    On count III (home invasion), the circuit court imposed no sentence.

¶ 59    On count IV (armed robbery), the circuit court sentenced defendant to imprisonment for 25 years, ordering that this prison term run consecutively to the prison terms imposed on counts II, V, and VI.

¶ 60     On count V (aggravated battery with a firearm), the circuit court sentenced defendant to imprisonment for 10 years, ordering that this prison term run consecutively to the prison terms imposed on counts II, IV, and VI.

¶ 61     On count VI (aggravated discharge of a firearm), the circuit court sentenced defendant to imprisonment for five years, ordering that this prison term run consecutively to the prison terms imposed on counts II, IV, and V.

¶ 62     Additionally, the circuit court ordered restitution in the amount of $80,498.70.

¶ 63     This appeal followed.

¶ 64                                    II. ANALYSIS
¶ 65                        A. Defendant's Request That We Strike the
                              "Background" From the State's Brief

¶ 66     For three reasons, defendant requests that we "strike the section of the State's brief titled 'Background.' "

¶ 67     First, the section is titled "Background" instead of "Statement of Facts" as Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018) requires. Titling the section "Background" instead of "Statement of Facts" is technically a violation of Rule 341(h)(6). But no confusion has resulted, and striking six pages from a brief because of a trivial misnomer would be unreasonable. To be sure, supreme court rules are rules rather than suggestions (*In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57), but not every violation of a supreme court rule must bring down draconian consequences.

¶ 68     Second, defendant characterizes the "Background" as argumentative. Rule 341(h)(6) requires a "Statement of Facts, which shall contain the facts necessary to an understanding of the case, stated accurately and fairly *without argument or comment*." (Emphasis added.) Ill. S. Ct. R. 341(h)(6) (eff. May 25, 2018). But we do not see how the "Background" in the State's brief is argumentative. It seems matter-of-fact to us. Defendant fails to point out any specific example of argumentativeness. Therefore, this second asserted reason for striking the "Background" from the State's brief is unpersuasive.

¶ 69     Third, defendant complains that the "Background" in the State's brief is "duplicative of facts presented in [defendant's] opening brief." We see nothing in Rule 341 forbidding the appellee from repeating a fact that appears in the appellant's brief. Under Rule 341(i), a "Statement of Facts" "*need not be included* [in the appellee's brief] except to the extent that the presentation by the appellant is deemed unsatisfactory." (Emphasis added.) Ill. S. Ct. R. 341(i) (eff. May 25, 2018). But this is not the same as saying that a "Statement of Facts" *must be excluded* from the appellee's brief except to the extent that the presentation by the appellant is deemed unsatisfactory. The appellee *may* write a "Statement of Facts" repeating every fact that the appellant already has provided—but the appellee does not *have* to do so. See *id.*

¶ 70     Consequently, we deny defendant's request to strike the "Background" from the State's brief.

¶ 71                        B. The Inapplicability of the Test in *Housby*
¶ 72     Defendant maintains that the State's evidence fails the test in *People v. Housby*, 84 Ill. 2d 415 (1981). But the test in *Housby* is inapplicable unless a certain kind of jury instruction is at issue: a jury instruction that explicitly permits the jury to draw an inference from a given

proved fact. In *Housby*, the proved fact was the defendant's unexplained possession of stolen property.

¶ 73    In *Housby*, the defendant stood trial for burglary. *Id.* at 419. The circuit court instructed the jury: " 'If you find that the defendant had exclusive possession of recently stolen property and there was no reasonable explanation of his possession, you may infer that the defendant obtained possession of the property by burglary.' " *Id.* The jury found the defendant guilty of burglary. *Id.* In his appeal, the defendant contended that the jury instruction had deprived him of due process by interfering with the jury's responsibility to determine the facts and by lightening the State's burden of proof. *Id.* For three reasons, which it had gleaned from decisions by the United States Supreme Court, the Illinois Supreme Court was unconvinced that the jury instruction, with its permissive inference, had deprived the defendant of due process:

> "(i) there was a rational connection between [the defendant's] recent possession of property stolen in the burglary and his participation in the burglary; (ii) his guilt of burglary is more likely than not to flow from his recent, unexplained and exclusive possession of burglary proceeds; and (iii) there was evidence corroborating [the defendant's] guilt." *Id.* at 424.

¶ 74    From that test in *Housby* for a permissive-inference jury instruction, defendant believes a broader principle can be derived. Defendant writes:

> "The Illinois Supreme Court has found that presumptions and inferences in criminal cases satisfy due process when: (1) the fact proved and the fact presumed are rationally connected, (2) the presumed fact is more likely than not to flow from the proved fact, and (3) the inference is supported by corroborating evidence of guilt."

In defendant's view, the inference that the circuit court drew in the present case—"[t]he presumed fact that [he] was an intruder into the Powell home"—fails the second element of the *Housby* test. "The presumed fact," defendant argues, "does not more than likely than not flow from the proved facts." Defendant considers the other two elements of *Housby* to be unsatisfied as well. He maintains that, unless the three elements of *Housby* are satisfied, it is unproven that he was a principal perpetrator.

¶ 75    The problem with this application of *Housby* is that, under *People v. Richardson*, 104 Ill. 2d 8, 12 (1984), it is a misapplication. As the supreme court made clear in *Richardson*, "[t]he *Housby* test applies only to instructions which advise a jury of inferences it may draw." *Id.* In the present case, defendant challenges no jury instruction. Therefore, *Housby* is inapplicable. See *id.*

¶ 76    Insomuch as the sufficiency of the evidence is at issue, the *only* applicable standard of review is that set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Jackson* "applies in all criminal cases," the supreme court has declared, "*regardless of the nature of the evidence.*" (Emphasis added.) *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson*, 443 U.S. at 319.

¶ 77          C. The Long Defunct Reasonable-Hypothesis-of-Innocence Test

¶ 78          Quoting from *People v. Branion*, 47 Ill. 2d 70, 77 (1970), defendant observes that, "[o]ver fifty years ago, the Illinois Supreme Court found that '[t]o support a conviction based on circumstantial evidence[,] it is essential that the facts proved be not only consistent with defendant's guilt, but they must be inconsistent with any reasonable hypothesis of innocence.' "

¶ 79          Forty years ago, however, the supreme court discarded the reasonable-hypothesis-of-innocence test. The supreme court declared:

> "[T]he reasonable hypothesis of innocence standard of review is no longer viable in Illinois. Instead, we find that the reasonable doubt test as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 261, should be applied in reviewing the sufficiency of evidence *in all criminal cases*, whether the evidence is direct or circumstantial." (Emphasis added.) *People v. Pintos*, 133 Ill. 2d 286, 291 (1989).

The reasonable doubt test in *Collins* is the reasonable doubt test in *Jackson*. *Collins*, 106 Ill. 2d at 261 (citing *Jackson*, 443 U.S. at 319).

¶ 80          D. "A Reasonable and Moral Certainty of the Defendant's Guilt"

¶ 81          Defendant observes that, "[f]or decades, Illinois appellate courts [*sic*] have found that a conviction based on circumstantial evidence must be of a conclusive caliber that bears the burden of proving with reasonable and moral certainty the defendant's guilt." He disputes that the State's evidence against him was of such a "conclusive caliber."

¶ 82          Sixty-five years ago, the supreme court taught: "[E]vidence must be of such a conclusive nature as to produce a reasonable and moral certainty of guilt which so thoroughly establishes the guilt of the accused that every reasonable hypothesis of innocence is excluded." *People v. Hansen*, 5 Ill. 2d 535, 538-39 (1955). Although appellate court cases can still be found repeating the "reasonable and moral certainty" language (see, *e.g.*, *People v. Schneider*, 2019 IL App (5th) 150106, ¶ 37; *People v. Jasoni*, 2012 IL App (2d) 110217, ¶ 19), such language is part of the defunct reasonable-hypothesis-of-innocence test (see *Pintos*, 133 Ill. 2d at 291).

¶ 83          Again, we emphasize that, in a criminal appeal, there is only one test for assessing whether the evidence is sufficient to sustain the conviction. We quote the supreme court's emphatic reminder:

> "This court has repeatedly held that the standard to be applied in reviewing the sufficiency of evidence in all cases, whether the evidence is direct or circumstantial [citation] is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Ward*, 154 Ill. 2d 272, 314 (1992) (quoting *Collins*, 106 Ill. 2d at 261).

There is no other test. There is no add-on. There is no alternative formulation.

¶ 84                          E. *Collins* Applied

¶ 85          We conclude that the evidence in this case passes the test in *Collins* (which is to say, the test in *Jackson*). We have scrutinized the following evidence in the light most favorable to the prosecution. See *id.*

¶ 86　　　　　　　　　　1. *The Fingerprints on a Tool of the Home Invasion,*
*Namely, the Pizza Box*

¶ 87　　　　Defendant quotes from *People v. Rhodes*, 85 Ill. 2d 241, 249 (1981):

> " '[I]n order to sustain a conviction solely on fingerprint evidence, fingerprints corresponding to the fingerprints of the defendant must have been found in the immediate vicinity of the crime under such circumstances as to establish beyond a reasonable doubt that the fingerprints were impressed at the time the crime was committed.' "

According to the State's own evidence, defendant observes, defendant's fingerprints were impressed on the pizza box at a time other than when the offenses were committed. The surveillance video from Casey's showed defendant buying the pizza. His fingerprints would have been impressed on the pizza box at Casey's, when he bought the pizza. Thus, defendant reasons, the State failed to "establish beyond a reasonable doubt that the fingerprints were impressed at the time the crime was committed," and, under *Rhodes*, his convictions cannot be sustained. *Id.*

¶ 88　　　　The quotation from *Rhodes*, however, is inapplicable because defendant's convictions are not "sustain[ed] *** *solely* on fingerprint evidence." (Emphasis added.) *Id.* The pizza box itself was an additional piece of evidence. It was a prop that the intruders used in gaining entry to the residence. This case is comparable to *People v. Malmenato*, 14 Ill. 2d 52, 56-57 (1958), in which flashlights were used in an attempted burglary and the defendant's fingerprint was found on a flashlight dropped in the path of the would-be burglars' flight. The flashlight was a tool used in the attempted burglary, and the defendant's fingerprint on the flashlight connected him to the crime. *Id.* at 58-59. Similarly, the pizza box was brought to the Powell residence and was used as a tool in the home invasion, and defendant's fingerprint on the pizza box connected him to the crime.

¶ 89　　　　Parks's fingerprint, in addition to defendant's fingerprint, was found on the pizza box. Parks was known to be a member of a rip-off crew, and it could be reasonably inferred that Parks was a principal participant in the offenses of November 9, 2016. So, on a pizza box that the perpetrators brought into the Powell residence and left there, defendant's fingerprint was found alongside the fingerprint of known member a rip-off crew. The call records prove that defendant was well acquainted with Parks.

¶ 90　　　　　　　　　　2. *Defendant's Presence at or Near the Powell Residence*
*About the Time When the Offenses Were Being Committed*

¶ 91　　　　The calls made from defendant's phone at 7:19 p.m. and 7:20 p.m. on November 9, 2016, were made in sector 2, and the calls made to defendant's phone at 7:26 p.m., 7:37 p.m., and 7:38 p.m. on November 9, 2016, were made in sector 3—or, alternatively, all five of those calls were made in the overlap between sectors 2 and 3, where the Powell residence was located. A trier of fact could reasonably find, therefore, that, about the time the offenses were committed, defendant was at or near the Powell residence. Granted, as defendant argues, "*[m]ere* presence at the scene of a crime does not render a person accountable for an offense." (Emphasis added.) 720 ILCS 5/5-2(c) (West 2016). Nevertheless, "a person's presence at the scene of a crime *** may be considered with other circumstances by the trier of fact when determining accountability." *Id.*

### 3. *Defendant's Lack of Candor to the Police*

In his statement to the police, defendant denied knowing Parks. Considering the extensive telephonic contact that defendant had with Parks before and immediately after the commission of the offenses, as well as Parks's fingerprint on the pizza box, alongside of defendant's fingerprint, this denial appears to have been a lie. And for reasons the circuit court explained, the rest of defendant's statement to the police—other than his purchase of the pizza at Casey's, which he was in no position to deny—struck the circuit court as implausible, too. Lying to the police "may be considered evidence of consciousness of guilt." *People v. Williams*, 176 Ill. App. 3d 73, 77 (1988). It could readily be inferred that the reason why defendant lied about his acquaintance with Parks was that he was in cahoots with Parks in the home invasion at 1528 Julie Drive.

### III. CONCLUSION

Viewing all the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, the elements of home invasion, armed robbery, aggravated battery with a firearm, and aggravated discharge of a firearm— either on a theory that defendant was one of the principal perpetrators or on a theory that he was accountable for the crimes of the principal perpetrators.

Affirmed.