NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241423-U

NO. 4-24-1423

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 28, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| KENNETH R. TURNBOW, | ) | No. 21CF298 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Knecht and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding (1) the evidence was sufficient for a jury to reasonably conclude defendant was guilty beyond a reasonable doubt of first degree murder and (2) defendant forfeited his claim the trial court erred when admitting hearsay testimony.

¶ 2    Defendant, Kenneth R. Turnbow, was convicted by a jury of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)). He was subsequently sentenced to 60 years' imprisonment. On appeal, he argues (1) the State failed to prove beyond a reasonable doubt he was the shooter and (2) the trial court erred when it permitted the State to introduce hearsay testimony. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4    In May 2021, defendant was charged by information with first degree murder for the shooting death of his wife, Tracie Turnbow (*id.*). He was subsequently indicted by a grand

jury.

¶ 5                                                A. Pretrial Proceedings

¶ 6            In January 2022, pursuant to section 115-10.2a of the Code of Criminal Procedure

of 1963 (Code) (725 ILCS 5/115-10.2a (West 2022)), the State moved to admit hearsay

testimony made by Tracie to numerous people about defendant's propensity for violence. The

State sought to introduce the testimony of the following individuals:

            1. Alma McWhirter, who would testify she had a conversation with Tracie

      in "early 2021." McWhirter asked Tracie if she feared for her life, to which Tracie

      had responded, " 'Maybe.' " When asked if defendant would hurt her, Tracie

      replied, " 'One day he will.' "

            2. Kathy Nagle, who would testify Tracie told her (a) she did not feel safe

      at home with defendant; (b) she was filing for a divorce from him; (c) he would

      " 'hang around her,' " which made her feel uncomfortable; and (d) she found a

      bullet hole in a window and a casing in a sofa cushion.

            3. Nicole Slee, Tracie's attorney in her pending divorce from defendant,

      and Lori Peters, Slee's assistant. Tracie left a voicemail at Slee's office, which

      stated:

            " 'Hi, Lori, this is Tracie, just realized something I forgot to mention to

            you and it's probably totally irrelevant but I thought I'd feel comfortable

            leaving it with you anyway. Um, [defendant] shot, with a small handgun

            my back window of the house. Um, and used a piece of like pillow

            stuffing for, ah, I don't know, for a silence or just to avoid having the glass

            completely shatter. But anyway, I thought I'd share with you just so you

know just in case I end up shot or something. I saw it coming. Alright thanks. Bye.' "

4. Mandi Woll, who would testify she spoke with Tracie two weeks prior to her being shot and killed. Tracie told Woll that (a) on May 4, 2021, she found a bullet hole in the window and the corresponding bullet in a pillow; (b) she had asked defendant if he was "practicing to kill her"; and (c) on May 5, 2021, " 'If I wind up dead, you know [defendant] killed me.' "

5. Lisa Lisenbee, who would testify Tracie had told her defendant was " 'aggressive.' "

6. Amanda Seelye, who would testify Tracie told her (a) in June 2020, she was in fear for her life; (b) she did not know what defendant was capable of doing to her; and (c) in May 2020, she said defendant was mentally and verbally abusive.

7. Sharon Johnston, Tracie's mother, would testify Tracie told her if she ever went missing, " 'you know who did it.' " Johnston was also aware of the bullet hole in the window.

8. Betty Hall, Tracie's friend, would testify about Tracie's pending divorce, defendant's extramarital relationships, and Tracie's finances.

¶ 7    In a written order in November 2022, the trial court, citing this court's decision in *People v. Richter*, 2012 IL App (4th) 101025, found section 115-10.2a of the Code applied to Tracie's statements and that she was unavailable. The court stated it had applied the 11 factors discussed in *Richter* to determine whether the witnesses' hearsay testimony provided a circumstantial guarantee of trustworthiness. The court noted the "interests of justice [would be]

served" by admitting McWhirter's statements and found that, because her statements were made within six months of Tracie's death, they were within a "sufficient proximity for admission." The court found Nagle's statements needed additional foundation to be admitted. The court found Tracie's statements to Slee and Peters were the most reliable because they were "Tracie's own words," presuming the State provided an adequate foundation. The court allowed Woll's and Johnson's statements, finding they were consistent with Tracie's voicemail and statements to other witnesses. The court denied the admission of Lisenbee's statements and denied the admission of Seelye's statements, noting they occurred nearly a year prior to Tracie's death. Additionally, the court stated no evidence was offered to suggest Johnston, as Tracie's mother, had an improper motive or reason to fabricate her statements. Lastly, the court was open to admitting any recorded statements by Tracie or defendant as testified to by Hall where an adequate foundation could be laid. However, the court denied admitting any of Hall's nonrecorded statements, finding they were conclusory opinions.

¶ 8          In March 2024, the State sought to introduce additional statements by Nagle and McWhirter. Nagle's statements concerned a conversation Tracie had with her two months prior to her death wherein she discussed defendant mentally abusing her and another conversation a few weeks prior to her death discussing a bullet she had found in a pillow. McWhirter's statements concerned conversations she had with Tracie in March 2021 and May 2021 wherein Tracie had stated defendant had threatened her and would kill her. In an April 2024 written order, the trial court, citing *Richter*, allowed the statements made by Nagle and McWhirter.

¶ 9          The matter proceeded to a jury trial in June 2024. We note, on appeal, defendant only challenges the sufficiency of the evidence to prove he was the one who shot Tracie. Therefore, we summarize the facts at trial relevant to the issue on appeal.

- 4 -

¶ 10                    B. Jury Trial and Posttrial Proceedings

¶ 11          Robert and Kari Harkleroad, defendant's neighbors, testified they discovered Tracie collapsed at their front door on the evening of May 17, 2021. Kaeli Harkleroad, their daughter, also testified and recalled looking out her upstairs bedroom window and observing a man on a bicycle. Robert performed cardiopulmonary resuscitation on Tracie until medical personnel arrived. The Harkleroad's teenage son was home at this time, but his presence was never disclosed to the police, and he was never interviewed. Kaeli recalled the man on the bicycle remained on the scene and "watch[ed]," but "at some point," he had left. This unknown man was never interviewed by the police. The Harkleroads did not hear any gunshots or, at the time, know Tracie had been shot.

¶ 12          Numerous police officers testified. Defendant had told police he had gone to work on the morning of May 17, 2021, and stopped at a store on his way home. He tended to his chickens and ducks before falling asleep watching television. He woke up shortly after 11 p.m. to notice Tracie was not home from work yet. He went to the basement and took a shower. He went back upstairs 10 to 15 minutes later and noticed lights flashing on the garage. He went outside to investigate, but the lights went off, so he went back inside. When he went to the front of the house because he had heard a commotion, he encountered police. Defendant accompanied the police to the police station, where he voluntarily cooperated with their investigation. In all, over several days, defendant was interviewed numerous times for several hours. He expressed concern about Tracie's well-being. Nothing incriminating was elicited from his statements to the police. Text messages between defendant and Tracie prior to the shooting were benign.

¶ 13          Police searched defendant's home for several days following the incident, but the gun used to shoot Tracie was not found. There was no evidence a firearm was discharged inside

the house. A small hole in a window was noted, but police determined it was caused by a BB. Police found two notes related to the hole in the window. One note stated, "Pretty obvious that you did fire your gun & damaged the window." Another note read, "Guess I found the bullet you fired. Not a BB after all! What's the purpose [defendant?]"

¶ 14 On May 22, 2021, Pekin Police Chief Seth Ranney went to defendant's home and located a .22-caliber revolver in the basement "on the backside of [a] rack on the ground between the rack and the wall."

¶ 15 An autopsy performed on Tracie revealed her cause of death was two gunshot wounds to her chest/abdomen. She was also shot in her left shoulder, but the wound was described as "superficial." Expert testimony revealed the bullet fragments recovered from Tracie's body were from .22-caliber bullets, which had been fired from the revolver discovered by Ranney.

¶ 16 Woll testified she had cut Tracie's hair on May 5, 2021, when Tracie told her, "If I end up dead, know he killed me." Tracie stated defendant had fired a gun in the house that caused a hole in a window. On cross-examination, Woll described defendant as "polite and kind" to her.

¶ 17 Nagle testified Tracie had told her she had found what she thought was a bullet hole in a storm door and a bullet. Nagle told Tracie to take the bullet to her lawyer.

¶ 18 McWhirter testified she lived across the street from defendant and Tracie. She recalled Tracie had come to her home in early May 2021 "agitated" and "afraid." Tracie told McWhirter "He's going to kill me, I just don't know when." Tracie also said she could not leave defendant because "she had nowhere to go" and "if she left, she would lose everything."

¶ 19 Peters testified she was a paralegal who worked for Tracie's divorce attorney.

Peters noted Tracie had filed for divorce in June 2020, but Tracie's previous attorney was not "pushing" the case. Peters noted defendant's financial records showed he was financially supporting a girlfriend. A voicemail from May 5, 2021, left by Tracie to her attorney's office was played for the jury. The voicemail said:

> "This is Tracie. Just realized something that I forgot to mention. Probably totally irrelevant. [Defendant] shot with a small handgun my back window at the house and used a piece of like pillow stuffing for um, I don't know, for a silence or just to avoid having the glass completely shatter. Let you know in case I end up shot or something. Ha ha ha! I saw it coming. Ha ha ha! Okay, bye."

¶ 20 On cross-examination, Peters stated no order of protection was pursued on behalf of Tracie following this incident. Tracie's financial records showed she had $53,000 in savings, of which $19,000 came from an inheritance, which would not be considered a marital asset in an impending divorce.

¶ 21 The State rested.

¶ 22 Heather Calvert, defendant's attorney for his divorce proceedings with Tracie, testified she was not aware of any violence in their marriage. She stated defendant had become "resigned to the fact that Tracie wanted to pursue [a] divorce." She described defendant as "very laid back" and never angry.

¶ 23 Numerous character witnesses testified on defendant's behalf and described him as nonviolent, levelheaded, and calm.

¶ 24 Defendant testified he was 69 years old and retired. He married Tracie in 1980. He had two children from previous marriages. He recalled Tracie had filed for divorce four times during the 31 years they had been married. He stated their marriage was not perfect and involved

"difficulties" and "conflict." He said they both decided to have an open marriage, which permitted him to have girlfriends, so long as he did not bring them home or discuss them with Tracie. He noted his annual income was over $143,000 and he was not worried about money if Tracie divorced him. He had a firearm owners identification card and a concealed carry license. He also noted Tracie had a firearm owner's identification card. Defendant stated he and Tracie owned several firearms, including the .22-caliber revolver seized by police. He said the .22-caliber revolver was his least powerful firearm. He used the revolver to protect the chickens. He did not recall Tracie ever verbally complaining about the BB hole in the window. He did not recall there being a hole until he was shown pictures of it after Tracie's death. He said he did not make the hole in the window and stated several kids in the neighborhood had BB guns.

¶ 25        Defendant recalled, prior to Tracie's death, people had entered his yard uninvited. He said somebody disassembled a boat motor that was in his yard, a lawn mower had been stolen, and he found cigarette butts on the floor of his shed. He said neither he nor Tracie smoked cigarettes. He believed someone had been sleeping in the shed because it had electricity. His testimony regarding the day of the incident matched his statements to the police. He said Tracie and he rarely fought and there was no conflict between them on the day she was shot.

¶ 26        Defendant rested.

¶ 27        In rebuttal, the State recalled a police officer, who testified no cigarette butts had been observed in the backyard and there had been no signs of someone living in the shed.

¶ 28        The jury found defendant guilty of murder and that he personally discharged a firearm, which proximately caused Tracie's death.

¶ 29        No posttrial motion was filed.

¶ 30        A presentence investigation report showed defendant had no criminal history,

- 8 -

aside from two speeding tickets. He worked for Caterpillar for several decades before retiring. After retiring in 2009, he continued to work full-time until he was subsequently arrested and charged for Tracie's death.

¶ 31　　Following a sentencing hearing in September 2024, the trial court sentenced defendant to 60 years in prison. Defendant filed a motion to reconsider sentence, which the court denied.

¶ 32　　This appeal followed.

¶ 33　　　　　　　　　　　II. ANALYSIS

¶ 34　　On appeal, defendant argues (1) the State failed to prove beyond a reasonable doubt that he shot Tracie and (2) the trial court erred when it permitted the State to introduce Tracie's out-of-court statements pursuant to section 115-10.2a of the Code. We address each claim in turn.

¶ 35　　　　　　　　A. Sufficiency of the Evidence Claim

¶ 36　　When examining the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess the witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 37　　For first degree murder, the State had to prove (1) defendant performed the acts

which caused Tracie's death and, (2) when he did so, he knew his acts would cause Tracie's death. 720 ILCS 5/9-1(a)(1) (West 2020). "An individual acts with knowledge when he is consciously aware that his conduct is practically certain to cause a particular result." *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26; see 720 ILCS 5/4-5(b) (West 2020). A defendant's mental state is rarely proven by direct evidence and, as such, is generally inferred from the character of the defendant's acts and from the circumstances surrounding the commission of the offense. *People v. Eubanks*, 2019 IL 123525, ¶ 74. "[T]he trier of fact is in the best position to determine whether a particular mental state is present." *People v. Pollard*, 2015 IL App (3d) 130467, ¶ 27.

¶ 38        As we noted earlier, defendant concedes Tracie was murdered when she was shot and killed in her own yard. He argues the State failed to produce any compelling evidence to prove who shot her. He notes there were no occurrence witnesses to Tracie's death, and no one heard any gunshots. He also notes there was a man on a bicycle observed by witnesses near Tracie when she collapsed in front of the Harkleroad's home. Additionally, the Harkleroad's teenage son was home at the time but was never interviewed by the police. There were no fingerprints, DNA, or gunshot residue evidence to support he was the shooter. He contends the police simply assumed he shot Tracie, without developing any evidence to support their theory. He also finds it "absurd" the police found the gun used to shoot Tracie several days later, after numerous detailed searches of the residence.

¶ 39        Defendant also argues the circumstantial evidence did not show he had any motive to shoot and kill Tracie. For example, he had no criminal history, a lengthy and commendable work history, which included working after retirement, ample income, an amicable divorce, and multiple character witnesses noting his calm and nonviolent demeanor.

¶ 40　　　　Lastly, defendant argues, in cases such as his, where the State offered no direct evidence of his guilt, additional standards apply. He cites *People v. Jasoni*, 2012 IL App (2d) 110217, ¶ 19, for the proposition that "[a] conviction based on circumstantial evidence must rest on proof of a conclusive nature that tends to lead to a satisfactory conclusion and produces a reasonable and moral certainty that the defendant and no one else committed the crime."

¶ 41　　　　Indeed, the jury was tasked with weighing all of the evidence to determine who shot Tracie. The jury found the State had proven beyond a reasonable doubt that defendant had personally discharged the firearm that caused Tracie's death. It was the jury's responsibility to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *Murray*, 2019 IL 123289, ¶ 19.

¶ 42　　　　There is no dispute Tracie was shot and killed on May 17, 2021. The issue at trial was whether defendant was the individual who shot her. The gun that was used to shoot Tracie belonged to defendant and was found in the basement, where he had been shortly before going outside and encountering the police. There was also evidence from witnesses that Tracie had told multiple people she believed defendant would shoot her. "[T]he appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992). After reviewing the evidence at trial, we find nothing so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of defendant's guilt. Therefore, we find a jury could reasonably and rationally conclude beyond a reasonable doubt that defendant shot Tracie, and when he did so, he knew his actions would cause her death.

¶ 43        Regarding the lack of evidence showing he had any motive or reason to kill Tracie, we note "[m]otive is not an essential element of the crime of murder, and the State has no obligation to prove motive in order to sustain a conviction of murder." (Internal quotation marks omitted.) *People v. Allen*, 2022 IL App (4th) 200554-U, ¶ 59.

¶ 44        Lastly, we find defendant's reliance on *Jasoni* misplaced. In *People v. Walker*, 2020 IL App (4th) 180774, ¶ 82, this court addressed the use of "reasonable and moral certainty" language, as used in *Jasoni*. We noted "such language is part of the defunct reasonable-hypothesis-of-innocence test." *Id.* We emphasized the existence of only one test for assessing the sufficiency of the evidence. *Id.* ¶ 83. As stated above, the test is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* We stated, "There is no other test. There is no add-on. There is no alternative formulation." *Id.* This is still true.

¶ 45        Defendant's contentions about unidentified or not-interviewed witnesses and the possibility of someone living in his shed do not change the question before this court. The question remains whether the evidence, viewed in a light most favorable to the prosecution, has shown *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *People v. Echoles*, 36 Ill. App. 3d 845, 852 (1976) ("As a court of review, we must ascertain whether the factual determination reached by the trier of fact was properly entertained, not whether a different finding could also be supported by the record."); *People v. Manning*, 182 Ill. 2d 193, 211 (1998) ("Regarding [the] defendant's insinuation that someone else murdered the victim, we note that speculation that another person might have committed the offense does not necessarily raise a reasonable doubt of the guilt of the accused."). We have already found a jury could reasonably and rationally conclude beyond a reasonable doubt that

defendant shot Tracie, and when he did so, he knew his actions would cause her death.

¶ 46                                    B. Hearsay Testimony Claim

¶ 47            Next, defendant argues the trial court erred when it permitted the State, pursuant to section 115-10.2a of the Code, to introduce the hearsay testimony of Woll, Nagle, McWhirter, and Peters and the voicemail recording Tracie left at her divorce attorney's office. He argues the plain meaning of the statute does not apply to first degree murder as a "domestic violence prosecution." He contends the hearsay testimony (1) did not meet the circumstantial guarantees of trustworthiness and did not constitute evidence of a material fact, (2) reflected Tracie's "nervousness based on her misapprehension of the BB 'hole in the window,' " and (3) was not evidence that was more probative on the point for which it was offered than any other evidence that could have been procured through reasonable efforts. He notes the State introduced extensive evidence concerning the BB hole in the window, which included handwritten notes from Tracie to defendant. He argues the hearsay testimony only served to inflame the jury and the interests of justice were not served by its admission. Lastly, he contends Tracie was not " 'unavailable' " within the enumerated meanings under the statute.

¶ 48            Defendant concedes this issue was forfeited because his trial counsel did not preserve this issue through a posttrial motion. He asks that we review it under the first prong of the plain-error doctrine.

¶ 49            The plain-error doctrine provides a "narrow and limited exception" to forfeiture, permitting courts of review to address forfeited claims. *People v. Reese*, 2017 IL 120011, ¶ 72. Under the plain-error doctrine, a reviewing court may disregard a defendant's forfeiture and consider an unpreserved claim of error where:

          " '(1) a clear or obvious error occurred and the evidence is so closely balanced

that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

Under either prong of the plain-error doctrine, the defendant bears the burden of persuasion. *People v. Wilmington*, 2013 IL 112938, ¶ 43. "The first step of plain-error review is determining whether any error occurred." *Thompson*, 238 Ill. 2d at 613.

¶ 50 Hearsay is an out-of-court statement offered to establish the truth of the matter asserted. *People v. Tenney*, 205 Ill. 2d 411, 432 (2002). Section 115-10.2a(a) of the Code creates a hearsay exception in domestic violence prosecutions for statements made by protected persons, such as a person abused by a family or household member. 725 ILCS 5/115-10.2a(a) (West 2024). Section 115-10.2a(a) provides a statement

> "not specifically covered by any other hearsay exception but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule if the declarant is identified as unavailable as defined in subsection (c) and if the court determines that:
>
> > (1) the statement is offered as evidence of a material fact; and
> >
> > (2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
> >
> > (3) the general purposes of this Section and the interests of justice

will best be served by admission of the statement into evidence." *Id.*

¶ 51 There are six circumstances where a declarant is considered "unavailable." *Id.* Death is not one of those six specifically listed circumstances. However, this court, in *Richter*, found death to render a declarant unavailable under the provisions of the Code. See *Richter*, 2012 IL App (4th) 101025, ¶¶ 87-93 (holding the defendant's prosecution for first degree murder was a "domestic violence prosecution" for the purposes of section 115-10.2a). In *Richter*, we concluded the factors implemented by the trial court in that case were useful when determining whether proffered hearsay statements possessed circumstantial guarantees of trustworthiness under section 115-10.2a of the Code. *Id.* ¶ 99. Those factors included:

> "(1) what motivation the specific witness might have to testify, (2) whether the statements were subject to cross-examination, (3) whether the statements were based on [the witness's] personal knowledge, (4) the spontaneity of the statements, (5) the lack of motive to fabricate the statements, (6) whether there was consistent repetition, (7) whether [the witness] was under duress or pressure when [he or] she made the statements, (8) whether [the witness] recanted or reaffirmed [his or] her statements, (9) whether the statements were made in response to leading questions, (10) the time that elapsed between each incident and [the witness's] statements about that incident to others, and (11) the existence of any reliable evidence that refuted [the witness's] statements." *Id.* ¶ 48.

We review a trial court's decision to introduce or exclude evidence, such as for a motion *in limine*, or its consideration of hearsay evidence, under an abuse of discretion standard. *Id.* ¶ 97.

¶ 52 We find defendant's arguments that a plain reading of the statute does not support

first degree murder as a "domestic violence prosecution" or that Tracie is not an " 'unavailable' " person were already answered in *Richter*. Aside from his disagreement with our interpretation of section 115-10.2a of the Code in *Richter*, defendant offers no reason for this court to reject our previous decision. See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010) ("Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion."). Accordingly, we find he has failed to show the trial court abused its discretion when applying *Richter* to conclude Tracie was unavailable and section 115-10.2a applied to his first degree murder prosecution.

¶ 53            The remainder of defendant's arguments also fail to show the trial court abused its discretion when admitting the testimonies of Woll, Nagle, McWhirter, and Peters. "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32. Tracie may have been nervous about or perhaps even misconstrued that the BB hole in the window was a bullet hole, but this alone does not make the hearsay testimony untrustworthy. The court stated it applied the 11 factors discussed in *Richter*. Many of the hearsay witnesses shared similar stories of Tracie's statements to them about defendant's conduct and her fear he would shoot her. The fact the State's evidence corroborated the hole in the window was caused by a BB does not make the hearsay testimony less probative. Defendant's argument that these statements only inflamed the jury does not mean the interest of justice would not be served by their admission. "[I]nflaming of the jury's passions is not directly barred; rather, any commentary that does so must also serve a different, proper purpose." *People v. Darr*, 2018 IL App (3d) 150562, ¶ 71. Despite Tracie incorrectly believing the BB hole in the window was caused by a bullet, her statements to Woll, Nagle, and McWhirter and her voicemail to her attorney reveal she believed defendant might shoot her. Nothing from this record suggests the

court's application of section 115-10.2aa of the Code was arbitrary, fanciful, or unreasonable. Accordingly, defendant has failed to show error, let alone plain error. Therefore, we honor his forfeiture of this issue.

¶ 54     Alternatively, defendant argues his trial counsel was ineffective for failing to preserve this issue on appeal. However, as we have just found, defendant has failed to show error. Where a defendant fails to show error, he cannot show ineffective assistance of counsel. See *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 52 (stating where a defendant fails to show error, it is fatal to both plain-error and ineffective-assistance-of-counsel claims).

¶ 55                              III. CONCLUSION

¶ 56     For the reasons stated, we affirm the trial court's judgment.

¶ 57     Affirmed.